IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| In re: | Case No. 3:19-bk-1971 |
| CAPSTONE PEDIATRICS, PLLC, | Chapter 11 |
| Debtor. | |
| | |
| CDS BUSINESS SERVICES, INC. d/b/a NEWTEK BUSINESS CREDIT, | |
| Plaintiff, | |
| v. | Adv. Proc. No. _____ |
| AMERICA CARES TRUST d/b/a CARENATION | |
| Defendant. | |

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Comes now the Plaintiff CDS Business Services, Inc. d/b/a Newtek Business Credit (hereinafter, "**CDS**") by and through counsel, pursuant to Fed. R. Bank. Proc. 7001 and 7065 and files this adversary proceeding complaint against America Cares Trust d/b/a CareNation ("**CareNation**"). In support thereof, CDS states as follows:

### I. JURISDICTION

1. This court may exercise personal jurisdiction over CareNation because it is a Tennessee nonprofit corporation that has previously entered an appearance in this bankruptcy case and because it expressly consented to the jurisdiction of this court to resolve any disputes related to the asset purchase agreement discussed herein.

2. This Court has original subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

3. Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

4. This case is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. BACKGROUND

5. On March 28, 2019 (the "**Petition Date**"), the Debtor Capstone Pediatrics, PLLC ("**Debtor**") commenced the underlying bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6. Among its "First Day Motions" was a request by Debtor to obtain "Debtor in Possession" financing ("**DIP Financing**") from CDS [DE 3], which request was granted first on an interim basis on April 4, 2019 [DE 50], thereafter on a final basis on May 14, 2019 [DE 104], and thereafter ultimately further amended to increase the amount of allowed indebtedness on April 3, 2020 [DE 204] (collectively, the "**DIP Financing Orders**").

7. In order to effectuate certain requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request for permission to continue to use its two existing bank accounts at Bank of America ("**Bank Account and Cash Management Motion**") [DE 5] – one of which accounts was its payroll account, bearing account no. XXXXXX7579 ("**Payroll Account**")- and the other of which was its primary operating account, bearing account no. XXXXXX6837 ("**Operating Account**"), the latter of which was subject to automatic daily sweeps in favor of CDS under the terms of the proposed DIP Facility (the "**DIP Facility**"). In addition, Debtor sought permission to open a third account with Bank of America, the sole purpose of which was to hold funds earmarked for professionals retained in the Bankruptcy Case, whose fees were included in the DIP Financing discussed below (the "**Carve-out Account**") (all of the foregoing referenced accounts of Debtor, including any accounts that may have been subsequently

opened post-petition on behalf of Debtor are hereinafter collectively referred to as the "**DIP Accounts**".) This court approved the Bank Account and Cash Management Motion on April 4, 2019 [DE 43].

8. In order to effectuate certain other requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request to authorize Debtor's retention of an independent Chief Restructuring Officer and separate Turnaround Advisory Firm, which motion was granted first on an interim basis on April 6, 2019 [DE 56] and thereafter on a final basis on May 17, 2019 [DE 109] (collectively the "**CRO/Turnaround Advisory Firm Retention Order**").

9. Pursuant to the terms of the CRO/Turnaround Advisory Firm Retention Order, the CRO and Turnaround Advisory Firm were granted the *sole* authority to act on behalf of Debtor with regard to, *inter alia*:

   a. Opening and closing bank accounts for Debtor;

   b. Writing checks for Debtor and transferring funds of Debtor;

   c. Causing Debtor to enforce any of its contractual rights; and

   d. Causing Debtor to comply with all guidelines of the Office of the United States Trustee.

10. On May 19, 2020, Debtor filed a motion to sell certain of its assets and assign certain of its contracts pursuant to 11 U.S.C. §§ 363 and 365 (the "**Sale Motion**") [DE 207].

11. The DIP Facility approved by the DIP Financing Orders matured on June 15, 2020 by its own terms. The balance thereunder became due to CDS immediately, Debtor was obligated to remit to CDS the collected proceeds of all accounts receivable upon receipt per the terms of the approved DIP Facility, and thereafter CDS made no further advances under the DIP Facility,

3

though between June 15 and June 23, 2020, CDS declined to exercise control over, and promptly returned to Debtor, certain "PCMH" advances[1] applied for by Debtor from TennCare, plus an additional approximately $3,700.00 in proceeds received, in order to facilitate Debtor's continued operations until the proposed asset sale could take place.

12. On July 20, 2020, this Court approved the sale of certain of Debtor's assets, and assignment of certain of Debtor's assumed contracts, to CareNation (the "**Asset Sale Order**") [DE 254] as set forth in that certain Asset Purchase Agreement dated July 8, 2020 (the "**APA**") attached thereto .

13. Without disclosing same to the Court, CDS or Debtor's counsel, the CRO and/or the Turnaround Advisory Firm had, during the pendency of this case and in violation of their obligations under the CRO/Turnaround Advisory Firm Retention Order, authorized an employee of Debtor - one Jonathan Garcia ("**Garcia**") - to control Debtor's DIP accounts by allowing him to become an authorized "Primary Administrator", on behalf of Debtor, on the Bank of America Cashpro® online platform. Specifically, Garcia, who was not an authorized signatory on any of the DIP Accounts, was empowered by reason of his designation as "Primary Adminisrator" to perform certain functions on behalf of the CRO and Turnaround Advisory Firm, including, *inter alia*, making electronic payments on behalf of Debtor from the DIP Accounts. Neither the CRO nor the Turnaround Advisory Firm disclosed such authorization to perform their exclusive duties under the CRO Order to the Court or any creditors, including CDS.

---

[1] Upon information and belief, the Patient-Centered Medical Home (PCMH) incentive is a program of TennCare that offers payment incentives to participating medical practices that adopt the functions of a patient-centered medical home as defined by applicable laws and regulations. Debtor was a qualified PCMH and received certain capitated payments based on its participation in the program. In the Spring of 2020, Debtor applied for certain PCMH "advance payments" that covered a period of time extending beyond the anticipated closing date of the sale of its operations. Not wishing to be in possession of funds that the payors of such advance payments might make in reliance on the assumption that Debtor would continue to provide services after the closing date, CDS disclaimed to Debtor any interest in any proceeds attributable to such advance payments.

14. To make matters worse, and despite the fact that the APA did not - and could not - transfer Debtor's DIP Accounts to CareNation, the CRO and/or Turnaround Advisory Firm apparently forgot to terminate Garcia's CashPro® access to Debtor's DIP Accounts after the closing of the sale.

15. Upon closing of the APA, Garcia's employment with Debtor was terminated and Garcia was hired by CareNation.

16. At some point thereafter, Garcia - or someone else at CareNation using Garcia's online credentials on CashPro® - began to make certain other agents of CareNation, including its president Michael Gaw, additional "primary administrators" with access to the DIP Accounts and ability to pay funds out of the accounts.

17. Thereafter, Garcia (or someone at CareNation acting under, or using, Garcia's access to Debtor's DIP Accounts on the CashPro® system) without notice to Debtor began using Debtor's DIP Accounts by, *inter alia*, depositing the proceeds of CareNation accounts receivable into the Carve-Out Account and paying expenses of CareNation from monies deposited into the Carve-Out Account.

18. Thereafter, commencing on or about August 14, 2020, again using its access via the CashPro® online platform, CareNation began withdrawing funds on a daily basis from the DIP Operating Account prior to the automatic sweep set to take place at midnight each night, thereby preventing CDS from being paid in accordance with the DIP Facility and the DIP Financing Orders. CareNation redirected these proceeds to the Carve-out Account into which CareNation was improperly depositing its own proceeds and paying its own debts.

19. Upon learning of CareNation's improper exercise of control over the DIP Operating Account, and the diversion of the funds from the DIP Operating Account into the DIP Carve-out

5

Account (against which there was no standing sweep order redirecting said monies to CDS), CDS contacted Bank of America. Bank of America stated that Michael Gaw, president of CareNation, represented to Bank of America that CareNation had bought the stock - rather than certain assets and contracts - of Debtor. As a result of this misrepresentation, Bank of America incorrectly permitted CareNation to (a) to deposit its own money into the DIP Carve-out Account, and (b) exercise unauthorized control over all of the DIP Accounts. As a further result, Bank of America permitted CareNation to unlawfully redirect money from the DIP Operating Account away from CDS, in violation of the DIP Facility as approved and ordered by the Court.

20. Undersigned counsel made demand on counsel for CareNation, through its counsel prior to his withdrawal, for immediate return of the funds improperly diverted by CareNation from the Operating Account, and Carenation has refused that demand.

21. Debtor's counsel has specifically informed CareNation in writing that CareNation is improperly exercising control over the DIP Accounts, and demanded that CareNation cease and desist immediately.

22. CareNation has likewise refused Debtor's demands and continues to improperly exercise control over the DIP Accounts which remain titled in Debtor's full legal name (Capstone Pediatrics PLLC) and which bear Debtor's tax identification number, and in the process, improperly collect the proceeds of Debtor's accounts receivable to which CDS is entitled to payment by virtue of the DIP Facility and Dip Orders (to be effectuated through the standing sweep order on the DIP Operating Account), and has refused to release any of the funds presently collected in the DIP Accounts.

## III. CAUSES OF ACTION

### COUNT I

### CONVERSION

23. The allegations set forth in the preceding paragraphs are incorporated and restated herein.

24. By improperly accessing the Debtor's DIP Accounts, and diverting from the Operating Account (with its standing sweep order) the collected proceeds of Debtor's accounts receivable, in which CDS holds a properly perfected senior security interest and to which it is entitled to payment via the standing sweep order approved by the DIP Financing Orders, CareNation has improperly intentionally exercised control, and has appropriated to its use and benefit, the property of CDS, and is therefore liable to CDS for Conversion.

25. CDS has been directly harmed by CareNation's Conversion in an amount, as of this date, of not less than $120,000.00. The damages to CDS continue to accrue daily as additional proceeds are diverted by CareNation.

### COUNT II

### TORTIOUS INTERFERENCE WITH CONTRACT/EXISTING ECONOMIC RELATION

26. The allegations set forth in the preceding paragraphs are incorporated and restated herein.

27. The terms of the DIP Facility approved by the DIP Financing Orders, which - *inter alia* - granted to CDS a senior security interest in all of Debtor's accounts receivable and collected proceeds thereof and imposes upon Debtor an obligation to hold same in trust for CDS and remit to CDS, constitutes a legal and binding obligation of Debtor to CDS.

7

28. CareNation was aware of the DIP Financing Orders, and the terms and conditions of the DIP Facility approved thereby.

29. CareNation intended to cause a breach of these contractual obligations between Debtor and CDS.

30. CareNation acted with malice and/or improper motives and means, inasmuch as it acted in violation of a known right of CDS. CareNation's improper motives and means are further demonstrated by its acts and omissions in violation the DIP Facility and comingling its operational funds within an account maintained by the Debtor in accordance with the Bankruptcy Code.

31. As a result of CareNation's actions, CareNation has caused Debtor to breach its obligations under the DIP Facility as approved by the DIP Financing Orders.

32. Debtor's breach of its obligations under the DIP Financing Orders was the proximate result of CareNation's actions.

33. CDS has been damaged by this breach in an amount, as of the date of filing this lawsuit, of not less than $120,000.00  Damages continue to accrue every day that CareNation continues to improperly exercise control over Debtor's DIP Accounts and divert the proceeds from the Operating Account over to the Carve-out Account.

34. CDS has further been damaged, as the senior secured creditor pursuant to the carve-Violatioout under the DIP Orders, inasmuch as CareNation's improper use of the Carve-Out Account as its *de facto* operating account, from which it makes disbursements for its own benefit, could arguably be deemed distributions from the Debtor's estate, for which the Debtor's estate could possibly incur fees to the United States Trustee. The carve-out in favor of CDS for its DIP Lien is subordinate to the fees of the United State Trustee.

## COUNT III

## VIOLATION OF TENN. CODE ANN. 47-50-109

35. The allegations set forth in the preceding paragraphs are incorporated and restated herein.

36. CareNation's actions constitute a violation of Tenn. Code Ann. § 47-50-109, inasmuch as it induced or procured the breach or violation, refusal or failure to perform, a contractual obligation of Debtor to CDS.

37. CDS has been damaged by this breach in an amount, as of the date of filing this lawsuit, of not less than $120,000.00  Damages continue to accrue every day that CareNation continues to improperly exercise control over Debtor's DIP accounts and divert the proceeds from the Operating Account over to the Carve-out Account.

38. CDS has further been damaged, as the senior secured creditor pursuant to the carve-out under the DIP Orders, inasmuch as CareNation's improper use of the Carve-Out Account as its *de facto* operating account, from which it makes disbursements for its own benefit, could arguably be deemed distributions from the Debtor's estate, for which the estate could possibly incur fees to the United States Trustee.  The carve-out in favor of CDS for its DIP Lien is subordinate to the fees of the United State Trustee.

39. CareNation is also statutorily liable to CDS in treble the amount of damages resulting from or incident to the breach of the contract it has procured or induced.

## COUNT IV

## BREACH OF CONTRACT

40. The allegations set forth in the preceding paragraphs are incorporated and restated herein.

9

41. CDS is the intended third--party beneficiary of Debtor's rights under the APA with standing to sue for its breach.

42. Under the terms of the APA, and in particular pursuant to section 9.04, CareNation is obligated to remit to CDS, within five business days' receipt thereof, all proceeds of accounts receivable generated by Debtor prior to the closing date and received by CareNation.

43. CareNation has refused to so perform these contractual obligations, and is in breach of the APA in an amount, as of the date of filing this lawsuit, in an amount not less than $120,000.00. Damages continue to accrue daily.

## COUNT V

## INJUNCTIVE RELIEF

44. The allegations set forth in the preceding paragraphs are incorporated and restated herein.

45. Pursuant to the DIP Financing Orders, CDS has, *inter alia*, the senior security interest in the proceeds of all accounts receivable of Debtor deposited into the DIP Accounts.

46. Based on the nefarious, bad faith actions taken by CareNation, both in its improper exercise over the DIP Accounts, interference with CDS' rights thereunder, and its breach of contract, injunctive relief is necessary both to protect the interests of CDS as well as to protect the Debtor's estate from the accumulation of United States Trustee fees charged based on the improper disbursements from the DIP Accounts to pay the expenses of CareNation.

47. Specifically, CDS requests injunctive relief as follows:

   a. Prohibiting CareNation, its agents, and any party acting in concert with CareNation, from accessing, depositing into, using, transferring into or out of, encumbering, or

10

Case 3:20-ap-90140   Doc 1   Filed 09/11/20   Entered 09/11/20 13:30:56   Desc Main
Document   Page 10 of 11

preventing access of Debtor Capstone Pediatrics, PLLC to, the Debtor's DIP Accounts ("DIP Accounts"), now or at any time during the pendency of this case, whether or not funds in those accounts were deposited by CareNation; and

b. Requiring CareNation to turn over to CDS all monies improperly taken from the Debtor's DIP Operating Account.

**WHEREFORE**, having prayed in full, CDS respectfully requests the following relief:

(1) For a judgment against CareNation in an amount to be determined at trial of this matter;

(2) For punitive and or statuory treble damages;

(3) For injunctive relief as set forth herein;

(4) For the right to amend this complaint as additional facts or developments warrant;

(5) For such other and further relief as this Court deems appropriate.

Respectfully submitted,

/s/ *Daniel H. Puryear* _____
Daniel H. Puryear, # 18190
Puryear Law Group PLLC
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205
615-255-4859 (phone)
615-630-6602 (fax)
dpuryear@puryearlawgroup.com

*Counsel for CDS Business Services, Inc.*
*d/b/a Newtek Business Credit*