IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 3:19-bk-1971 |
| CAPSTONE PEDIATRICS, PLLC, ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| _____) | |
| ) | |
| CDS BUSINESS SERVICES, INC. d/b/a ) | |
| NEWTEK BUSINESS CREDIT. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. Proc. No. 3:20-ap-90140 |
| ) | |
| ) | |
| AMERICA CARES TRUST d/b/a ) | |
| CARENATION ) | |
| ) | |
| Defendant. ) | |

---

EXPEDITED MOTION AND SUPPORTING MEMORANDUM FOR PRELIMINARY
INJUNCTION

---

Comes now CDS Business Services, Inc. d/b/a Newtek Business Credit (hereinafter, "**CDS**"), pursuant to the rules and statutes set forth herein, Fed. R. Bankr. P. 7065, and LBR 9075-1, and files this expedited motion and memorandum in support for injunctive relief.

**EXPEDITED RELIEF REQUESTED**

1. **Expedited Relief Requested.** CDS requests that the Court (a) conduct an expedited hearing via Zoom on the relief requested in Count V of the adversary complaint filed in this matter (Request for Injunctive relief) and, after that hearing, (b) enter an immediately effective

preliminary injunction prohibiting CareNation, its agents, and any party acting in concert with CareNation, from accessing, depositing into, withdrawing from, viewing, using, transferring into or out of, encumbering, or preventing access of Debtor Capstone Pediatrics, PLLC to, any of the Debtor's DIP Accounts used at any time in this case including, but not limited to, those certain Bank of America accounts in the name of Capstone Pediatrics PLLC bearing account numbers XXXXXXX837 (the "Operating Account") and XXXXXXX239 (the "Carve-Out Account")(both accounts, and any other accounts maintained by Debtor at any time in this case referred to collectively as the "DIP Accounts")[1]

2. **Need for Expedited Order.** CareNation's continuing illegal and improper exercise of control and dominion over Debtor's DIP Accounts, which accounts exist in this case at this time solely for the purpose of acting as a vehicle by which CDS may collect on its cash collateral, has already caused losses to CDS in excess of $120,000.00, and those losses increase by thousands of dollars every day that CareNation continues this course of conduct. In addition, CareNation has begun commingling its own operating funds with the funds held in trust for CDS in the DIP Accounts and begun paying certain of its own operating expenses from one or more of these DIP accounts. CareNation has been informed by both CDS and Debtor of the improper nature of its actions and has stated an unwillingness to terminate its behavior. Given CareNation's apparent immediate need for CDS' money, to which it has no claim, in order to pay its ongoing business expenses, CDS has legitimate concerns regarding CareNation's solvency and its ability to pay damages awarded against it at the conclusion of a trial on the merits.

3. **Notice**. A copy of this expedited motion, a copy of proposed order setting hearing thereon, and a copy of the complaint filed in this matter are being provided this day to (1) all parties

---

[1] All but the last 3 numbers of each account are redacted

consenting to electronic service via the Court's CM/ECF system; (2) the office of the United States Trustee via email; (3) Debtor's bankruptcy counsel via email; and (4) CareNation via federal express to its registered agent for service of process, as well as to the last known email address for that agent.

4. **Suggested Hearing Date.** CDS requests a hearing upon this motion on Thursday, September 17, 2020 or as soon thereafter as possible.

5. **Supporting Argument.**

    5.1    **Facts**

1. On March 28, 2019 (the **"Petition Date"**), the Debtor Capstone Pediatrics, PLLC (**"Debtor"**) commenced the underlying bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. Among its "First Day Motions" was a request by Debtor to obtain "Debtor in Possession" financing (**"DIP Financing"**) from CDS [DE 3], which request was granted first on an interim basis on April 4, 2019 [DE 50], thereafter on a final basis on May 14, 2019 [DE 104], and thereafter ultimately further amended to increase the amount of allowed indebtedness on April 3, 2020 [DE 204] (collectively, the **"DIP Financing Orders"**).

3. In order to effectuate certain requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request for permission to continue to use its two existing bank accounts at Bank of America (**"Bank Account and Cash Management Motion"**) [DE 5] – one of which accounts was its payroll account, bearing account no. XXXXXX7579 (**"Payroll Account"**)- and the other of which was its primary operating account, bearing account no. XXXXXX6837 (**"Operating Account"**), the latter of which was subject to automatic daily sweeps in favor of CDS under the terms of the proposed DIP Facility (the **"DIP Facility"**). In

3

addition, Debtor sought permission to open a third account with Bank of America, the sole purpose of which was to hold funds earmarked for professionals retained in the Bankruptcy Case, whose fees were included in the DIP Financing discussed below (the "**Carve-out Account**") (all of the foregoing referenced accounts of Debtor, including any accounts that may have been subsequently opened post-petition on behalf of Debtor are hereinafter collectively referred to as the "**DIP Accounts**".) This court approved the Bank Account and Cash Management Motion on April 4, 2019 [DE 43].

4. In order to effectuate certain other requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request to authorize Debtor's retention of an independent Chief Restructuring Officer and separate Turnaround Advisory Firm, which motion was granted first on an interim basis on April 6, 2019 [DE 56] and thereafter on a final basis on May 17, 2019 [DE 109] (collectively the "**CRO/Turnaround Advisory Firm Retention Order**").

5. Pursuant to the terms of the CRO/Turnaround Advisory Firm Retention Order, the CRO and Turnaround Advisory Firm were granted the *sole* authority to act on behalf of Debtor with regard to, *inter alia*:

   a. Opening and closing bank accounts for Debtor;

   b. Writing checks for Debtor and transferring funds of Debtor;

   c. Causing Debtor to enforce any of its contractual rights; and

   d. Causing Debtor to comply with all guidelines of the Office of the United States Trustee.

6. On May 19, 2020, Debtor filed a motion to sell certain of its assets and assign certain of its contracts pursuant to 11 U.S.C. §§ 363 and 365 (the "**Sale Motion**") [DE 207].

4

Case 3:20-ap-90140    Doc 4    Filed 09/11/20    Entered 09/11/20 15:07:23    Desc Main
Document      Page 4 of 15

7. The DIP Facility approved by the DIP Financing Orders matured on June 15, 2020 by its own terms. The balance thereunder became due to CDS immediately, Debtor was obligated to remit to CDS the collected proceeds of all accounts receivable upon receipt per the terms of the approved DIP Facility, and thereafter CDS made no further advances under the DIP Facility, though between June 15 and June 23, 2020, CDS declined to exercise control over, and promptly returned to Debtor, certain "PCMH" advances[2] applied for by Debtor from TennCare, plus an additional approximately $3,700.00 in proceeds received, in order to facilitate Debtor's continued operations until the proposed asset sale could take place.

8. On July 20, 2020, this Court approved the sale of certain of Debtor's assets, and assignment of certain of Debtor's assumed contracts, to CareNation (the "**Asset Sale Order**") [DE 254] as set forth in that certain Asset Purchase Agreement dated July 8, 2020 (the "**APA**") attached thereto .

9. Without disclosing same to the Court, CDS or Debtor's counsel, the CRO and/or the Turnaround Advisory Firm had, during the pendency of this case and in violation of their obligations under the CRO/Turnaround Advisory Firm Retention Order, authorized an employee of Debtor - one Jonathan Garcia ("**Garcia**") - to control Debtor's DIP accounts by allowing him to become an authorized "Primary Administrator", on behalf of Debtor, on the Bank of America Cashpro® online platform. Specifically, Garcia, who was not an authorized signatory on any of the DIP Accounts, was empowered by reason of his designation as "Primary Adminisrator" to

---

[2] Upon information and belief, the Patient-Centered Medical Home (PCMH) incentive is a program of TennCare that offers payment incentives to participating medical practices that adopt the functions of a patient-centered medical home as defined by applicable laws and regulations. Debtor was a qualified PCMH and received certain capitated payments based on its participation in the program. In the Spring of 2020, Debtor applied for certain PCMH "advance payments" that covered a period of time extending beyond the anticipated closing date of the sale of its operations. Not wishing to be in possession of funds that the payors of such advance payments might make in reliance on the assumption that Debtor would continue to provide services after the closing date, CDS disclaimed to Debtor any interest in any proceeds attributable to such advance payments.

perform certain functions on behalf of the CRO and Turnaround Advisory Firm, including, *inter alia*, making electronic payments on behalf of Debtor from the DIP Accounts. Neither the CRO nor the Turnaround Advisory Firm disclosed such authorization to perform their exclusive duties under the CRO Order to the Court or any creditors, including CDS.

10. To make matters worse, and despite the fact that the APA did not - and could not - transfer Debtor's DIP Accounts to CareNation, the CRO and/or Turnaround Advisory Firm apparently forgot to terminate Garcia's CashPro® access to Debtor's DIP Accounts after the closing of the sale.

11. Upon closing of the APA, Garcia's employment with Debtor was terminated and Garcia was hired by CareNation.

12. At some point thereafter, Garcia - or someone else at CareNation using Garcia's online credentials on CashPro® - began to make certain other agents of CareNation, including its president Michael Gaw, additional "primary administrators" with access to the DIP Accounts and ability to pay funds out of the accounts.

13. Thereafter, Garcia (or someone at CareNation acting under, or using, Garcia's access to Debtor's DIP Accounts on the CashPro® system) without notice to Debtor began using Debtor's DIP Accounts by, *inter alia*, depositing the proceeds of CareNation accounts receivable into the Carve-Out Account and paying expenses of CareNation from monies deposited into the Carve-Out Account.

14. Thereafter, commencing on or about August 14, 2020, again using its access via the CashPro® online platform, CareNation began withdrawing funds on a daily basis from the DIP Operating Account prior to the automatic sweep set to take place at midnight each night, thereby preventing CDS from being paid in accordance with the DIP Facility and the DIP Financing

6

Orders. CareNation redirected these proceeds to the Carve-out Account into which CareNation was improperly depositing its own proceeds and paying its own debts.

15. Upon learning of CareNation's improper exercise of control over the DIP Operating Account, and the diversion of the funds from the DIP Operating Account into the DIP Carve-out Account (against which there was no standing sweep order redirecting said monies to CDS), CDS contacted Bank of America. Bank of America stated that Michael Gaw, president of CareNation, represented to Bank of America that CareNation had bought the stock - rather than certain assets and contracts - of Debtor. As a result of this misrepresentation, Bank of America incorrectly permitted CareNation to (a) to deposit its own money into the DIP Carve-out Account, and (b) exercise unauthorized control over all of the DIP Accounts. As a further result, Bank of America permitted CareNation to unlawfully redirect money from the DIP Operating Account away from CDS, in violation of the DIP Facility as approved and ordered by the Court.

16. Undersigned counsel made demand on counsel for CareNation, through its counsel prior to his withdrawal, for immediate return of the funds improperly diverted by CareNation from the Operating Account, and Carenation has refused that demand.

17. Debtor's counsel has specifically informed CareNation in writing that CareNation is improperly exercising control over the DIP Accounts, and demanded that CareNation cease and desist immediately.

18. CareNation has likewise refused Debtor's demands and continues to improperly exercise control over the DIP Accounts which remain titled in Debtor's full legal name (Capstone Pediatrics PLLC) and which bear Debtor's tax identification number, and in the process, improperly collect the proceeds of Debtor's accounts receivable to which CDS is entitled to payment by virtue of the DIP Facility and Dip Orders (to be effectuated through the standing sweep

7

order on the DIP Operating Account), and has refused to release any of the funds presently collected in the DIP Accounts.

### 5.2 Legal Standard for a Preliminary Injunction

CDS is entitled to a preliminary injunction because it risks irreparable harm and can show a likelihood of success on the merits.

> A preliminary injunction should be granted only if the movant carries its burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to afford such relief, the court must consider and balance four factors: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

*Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *2–3 (M.D. Tenn. Aug. 28, 2020).

Granting the injunction will not harm CareNation since it does not even arguably have any good faith basis – contractually, legally or equitably – to access or make any use whatsoever of the DIP Accounts in the name of the Debtor and under the Debtor's tax identification number. To the extent that CareNation has improperly deposited its own funds into one or more of the Debtor's DIP Accounts, arrangements can be made in short order after the *status quo* is preserved in order to allow Debtor to transfer to CareNation such of its own funds that it has improperly deposited into one or more of the DIP Accounts, after first ensuring that the monies owed CDS, and improperly diverted from the Operating Account (and its daily sweep feature) are preserved for CDS, and any necessary accounting concerning entitlement to those funds. Therefore, there is no risk of harm to CareNation, since any monies to which it is entitled may be remitted to an appropriate bank account of CareNation in very short order.

Likewise, the public interest is affirmatively served by ensuring that the various Federal Banking Laws and Regulations discussed in this motion- including the "Know Your Customer" regulations- are upheld.

The essential questions before the Court, in deciding this request for a *preliminary* injunction are the likelihood of success on the merits (presented first herein for the sake of clarity) and the irreparable harm. Each of those are discussed below.

### 5.3  CDS will succeed on the merits because the APA itself, Bank of America's own deposit account Agreement terms, and applicable federal banking law all demonstrate that Debtor's own bank accounts were not, and could not be, transferred to CareNation

5.3(a)- The APA does not purport to transfer the Debtor's DIP Accounts

As a threshold matter, the APA clearly did not purport to transfer the Debtor's DIP Accounts, and there is no reasonable basis to argue otherwise. It is well settled law that a deposit account- as opposed to the cash in the account- is a *contractual relationship* between the account holder and the bank, under which contract the account holder is entitled to deposit money in the bank at will and, in the process, become a creditor of that bank. *See Bank of Marin v. England*, 385 U.S. 99, 101 (1966) (stating, "The relationship of bank and depositor is that of debtor and creditor, founded upon contract."); *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) (finding that an administrative freeze on a bank account is not an attempt to exercise control over property of the estate because the account itself is nothing more than a contractual obligation- a promise to pay the depositor, on demand, monies deposited). As Professor Thomas Plank of the University of Tennessee has explained in discussing the logic of the Supreme Court's decision in *Strumpf*:

> [I]n other words, the interest of the debtor in a bank account- the property of the

9

Case 3:20-ap-90140   Doc 4   Filed 09/11/20   Entered 09/11/20 15:07:23   Desc Main
Document    Page 9 of 15

estate- is not an interest in some separate property item, but only the rights that the debtor had under his contract with the bank that established the account.

*The Security of Securitization and the Future of Security*, 25 Cardozo L. Rev. 1655, 1716 (2004).

The APA clearly excludes from the assets to be sold, or contracts to be assigned, "any contract that is not an Assumed Contract". See, APA, section 2.2(i). "Assumed Contracts" is a term defined in APA Section 2.05(a)(i), which limits the list of available contracts available to be potentially assigned to certain enumerated "executory contracts" listed on Schedule 2.05(a). The deposit account agreements between Debtor and Bank of America is notably not on that list, and APA Section 2.05(a) prominently states that any contract not listed as available for assignment and specifically designated by CareNation for assumption "shall not be considered Assumed Contracts or Acquired Assets and shall automatically be deemed 'Excluded Contracts'".

Putting aside the obvious fact that it would be nonsensical for a Debtor to even contemplate assigning its DIP Account agreements with a Bank in a case that continues in existence after a § 363 sale and in which the Debtor has continuing obligations to a secured creditor that relies on the functionality of those deposit accounts (since to do so would automatically put the DIP in violation of the United States Trustee guidelines requiring the maintenance of one or more DIP Accounts during the pendency of a case), there is another and perhaps more fundamental reason why the DIP Accounts are not listed as available for assignment. That is, the only contracts that the APA contemplated assigning were certain Executory contracts, and DIP Account Agreements- entered into post-petition by the Debtor- which are, by definition, not "Executory Contracts". *See Ballas v. Revco D.S., Inc. (In re Revco D.S., Inc.),* <u>1994 WL 376884, at *2 (6th Cir. July 18, 1994)</u> (unpublished per curiam) (finding that "[s]ection 365 does not apply to postpetition contracts or leases negotiated by the debtor-in-possession on behalf of the bankruptcy estate).

5.3(b) The purported transfer would violate Federal Banking Law.

For that matter, even had Debtor wanted to assign its bank accounts, it could not have done so, at least not without advance consent sought and obtained from Bank of America. *As Bank of America- the very bank at which these accounts are held in this matter- has itself* noted, bank accounts themselves cannot be sold or assigned. Not only would it be a violation of Bank of America's own standard Deposit Account Agreement[3], it is also prohibited by federal banking rules and regulations. In the filing captioned "Limited Objection of Bank of America", in the case *In re Reichhold Holdings, Inc.*, 2014 WL 7779924 (Bankr. D. Del. 2014)[4], Bank of America addressed a situation in which the Debtor actually did attempt to sell its bank accounts (unlike the situation in the present case). In objection to that purported sale, Bank of America explained:

> ***Applicable Non-Bankruptcy Law Prohibits Transfer of Deposit Accounts.***
>
> 21. Of course, with approval of this Court, the Debtors may transfer to the Successful Bidder the *balances* in their unrestricted (*i.e.*, excluding cash collateral) deposit accounts in connection with a sale of their assets. However, the applicable deposit account agreements expressly prohibit any Debtor from transferring a deposit account *itself* to another person.
>
> 22. Further, banking rules and regulations, including, without limitation, the USA Patriot Act and its implementing regulations, do not permit deposit account holders to transfer deposit accounts to others. Instead, depository banks are required to obtain, evaluate and (in certain circumstances) verify specific information from all account holders in order to comply with applicable non-bankruptcy law. The information that banks are required to obtain, evaluate and verify depends in large part upon specific facts regarding the identity of the account holder, such as whether the account holder is an entity or a human being and the locations in which the account holder resides and does business. *See, e.g.*, 31 C.F.R. § 1020.220 ("[customer identification] procedures must enable the bank to form a reasonable belief that it knows the true identity of each customer. These procedures must be based on the bank's assessment of the relevant risks, including those presented by

---

[3] The terms of the standard Bank of America deposit account agreement (which may be accessed online at https://www.bankofamerica.com/deposits/resources/deposit-agreements.go), specifically states that Bank of America accounts are non-transferrable and non-negotiable.

[4] In response to Bank of America's objection, the Debtor in that case promptly removed any reference to an attempt to transfer the bank accounts themselves.

11

the various types of accounts maintained by the bank, the various methods of opening accounts provided by the bank, the various types of identifying information available, and the bank's size, location, and customer base").

23. As a result of the express terms of Bank of America's deposit account agreement and applicable non-bankruptcy law, deposit accounts themselves are not transferable from one person to another, and the only method by which a new account holder may obtain "ownership" of a deposit account is to open a new one.

<u>5.3(c) Apart from the plain language of the APA, the parties never contemplated or demonstrated any intention to assign the DIP Accounts.</u>

Neither Debtor nor CareNation sought the consent of Bank of America to any transfer of the DIP Accounts, and the Bank of America deposit account agreements are not listed as contracts capable of being assigned and therefore are contractually "excluded assets". This makes perfect sense since Debtor and CareNation also specifically excluded from the assets purchased all cash on deposit at the time of the closing *and* all contracts as well as any agreements of Debtor that "relate to" the excluded assets. It would make no sense- and in fact would be impossible- to *exclude* the cash on deposit with Bank of America, as well as any contracts that relate to that cash on deposit (which would include the deposit account agreement), but then at the same time *include* the very same deposit account agreements establishing the very accounts with the cash not sold.

Lest there be any doubt on this point, Section 2.05(c) of the APA, entitled "Non-Assignment of Contracts and Permits" specifically states that:

> Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a violation of a Legal Requirement or a breach of such Contract or Permit.

<u>5.3(d) As a matter of law, the parties to a Banking Account Relationship are the Bank and the customer whose full legal name and SSN/TIN are identified on the account</u>**.**

Even if a bank account agreement were assignable or otherwise "transferrable property", no such assignment would be binding and effective in any event unless and until the Bank's records correctly identify the full and correct name and SSN/TIN of the account holder. This is required not only by the federal banking laws and regulations referenced by Bank of America, but is in fact stated on Bank of America's own standard "Deposit Account Agreement and Disclosures" attached hereto as **Exhibit 1**.

Those disclosures provide that, *inter alia*, any change to the account is not effective until Bank of America has acted on the new information:

> When you open an account, we may rely on information you give us and we maintain in our records. *We determine the type and ownership of the account from this information. When you ask us to make a change to this information or your account, and we agree to the change, the change is not effective until we have had a reasonable time to act on the new information.* As an example, if you ask us to change the signers on your account, your requested change is not effective until we have a reasonable time to act on it.

(Exhibit , *Deposit Agreement and Disclosures,* "Account Ownership"*,* page 7; emphasis added). Bank of America's Deposit Agreement further requires that the account holder certify that it has provided the correct TIN in order to comply with the IRS's requirement that the bank backup withheld interest paid to the account in the event that the name and TIN provided are incorrect. (*Id.* at 68, "Tax Information").

Because Debtor remains the contractual party to the deposit agreement on the DIP Account, and because the account is in Debtor's name and under Debtor's TIN number, it remains the "owner" of the bank account as a matter of law.

**5.4. CareNation's misappropriation of the DIP Accounts has caused, and will continue to cause, irreparable harm to CDS.**

CDS will sustain irreparable harm in the absence of a preliminary injunction. CareNation's unlawful and wrongful control over the DIP Accounts, itself the product of its own inappropriate actions of accessing these accounts via the online CashPro® access of a former Debtor employee whose access was accidentally not terminated after his employment was terminated, has delayed and disrupted timely payment to CDS ordered by this Court in the DIP Financing Orders. That CareNation has not only begun using the DIP Carve-Out Account as its own, but has also begun circumventing the standing sweep order on the DIP Operating Account in order to get CDS' money presumably to use in its own operations, raises serious concerns about CareNation's solvency and ability to refund CDS' money at the conclusion of this matter. Delays also present an accounting nightmare as CareNation commingles its own money with that of CDS every day. The longer this goes on, the greater the risk that CDS is unable to recoup the damages ultimately awarded it, and the greater the harm to the banking system by these continuing violations of federal banking laws and regulations. In short, the harm is irreparable both to CDS and to the public at large.

## CONCLUSION

There is no basis in contract, law or equity by which CareNation can possibly claim a right to access, let alone exercise dominion and control over, any of Debtor's DIP Accounts. It is also equally clear that party's use of a bank account under the name of a different legal entity and under a different tax identification number violates numerous federal banking laws and regulations.

The damage that CareNation has done, and continues to do every day that it continues this wrongful and illegal course of action- not only to CDS but to the entire legal system- can only effectively be resolved by immediate injunctive relief. As noted above, once the *status quo* can

be maintained, and while reserving all rights as to all damages (including treble damages) sought in the complaint, and for which a claim will be made at trial of this matter, CDS is willing to allow Debtor to transfer out of the Debtor's DIP Carve-Out Account, and to such bank account as CareNation designates, such money as CareNation has not actually wrongfully diverted from CDS by circumventing the standing sweep order under the Operating Account.

As such, CDS respectfully prays for a preliminary injunction, issued on an expedited basis, as set forth herein.

Respectfully submitted,

/s/ *Daniel H. Puryear*
Daniel H. Puryear, # 18190
Puryear Law Group PLLC
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205
615-255-4859 (phone)
615-630-6602 (fax)
dpuryear@puryearlawgroup.com

*Counsel for CDS Business Services, Inc.*
*d/b/a Newtek Business Credit*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed electronically on September 11, 2020. Notice of this filing was sent by operation of the Court's electronic filing system to all those parties specifically requesting electronic service and as indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. In addition, notice was sent in the manner set forth in section 3, above.

*/s/ Daniel H. Puryear*
Daniel H. Puryear