IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | Case No. 3:19-bk-1971 |
| **CAPSTONE PEDIATRICS, PLLC,** | ) | |
| | ) | **Chapter 11** |
| **Debtor.** | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| **CDS BUSINESS SERVICES, INC.** | ) | |
| **d/b/a NEWTEK BUSINESS CREDIT.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 3:20-ap-90140 |
| | ) | |
| | ) | |
| **AMERICA CARES TRUST d/b/a** | ) | |
| **CARENATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

___

**AMERICA CARES TRUST d/b/a CARENATION'S EXPEDITED MOTION AND
SUPPORTING MEMORANDUM FOR
LIMITED RELIEF FROM AGREED ORDER GRANTING EXPEDITED MOTION FOR
PRELIMINARY INJUNCTION**
___

Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, and Rule 9075-1 of the Local Rules of this Court, Defendant America Cares Trust, Inc., a Tennessee not for profit corporation doing business as CareNation (hereinafter "**CareNation**"), by and through the undersigned counsel, respectfully submits this Expedited Motion for Limited Relief from the "Agreed Order Granting Expedited Motion for Preliminary Injunction" (Doc. 12) (hereinafter the "**Preliminary Injunction**") upon the Expedited Motion of Plaintiff, CDS Business Services, Inc. doing business as Newtek Business Credit (hereinafter "**CDS**") for Preliminary Injunction (Doc. 4) in the above-styled proceeding.

1

1. **Expedited Relief Requested.** The Preliminary Injunction reads in pertinent part:

> America Cares Trust (ACT), d/b/a CareNation, its agents (specifically including, but not limited to, Michael Gaw), and any party acting in concert with CareNation, are enjoined, pending further order of this court, from accessing, depositing into, withdrawing from, viewing, using, transferring into or out of, encumbering, or preventing access of Debtor Capstone Pediatrics, PPLC ("Debtor") to any of Debtor's DIP Accounts used or opened at any time in this case including, but not limited to, those certain Bank of America accounts in the name of Debtor bearing account numbers XXXXXXX837, XXXXXXX7579 and XXXXXXX239. In addition, and immediately upon entry of this Order, Michael Gaw of CareNation shall ensure that all checks to any of Debtor's DIP Accounts are immediately turned over to Jim Davis, Chief Restructuring officer for Debtor, at such location as Davis may direct to CareNation and/or Gaw.

CareNation moves this Court to conduct an expedited hearing for limited relief in the form of a disbursement in the amount of Seventy-Two Thousand and 0/100 Dollars ($72,000.00) (the proposed "**Payroll Disbursement**") to payroll obligations that are due and owing as of September 18, 2020 (said date hereinafter the "**Payroll Date**") for Capstone Pediatrics, a division of CareNation's employees, including medical professionals and administrative staff. In the absence of relief, CareNation will be compelled to interrupt, or cease altogether, its current operations, which involve the provision of pediatric care to tens of thousands of families throughout Middle Tennessee, many of whom are beneficiaries of the TennCare program.

2. **Need for Expedited Order.** CareNation requires the limited relief from the putative Preliminary Injunction to ensure that there is no interruption of essential medical services to its pediatric patients, many of whom are infants, children and teens with chronic medical conditions requiring continuous and/or immediate treatment. The relief sought would enable CareNation to make its current payroll and ensure medical services is not interrupted or halted altogether. In the absence of injunctive relief, CareNation's patient base would be immediately and perhaps irreparably impacted, and CareNation's medical professionals could be exposed to significant professional liability.

The need for the relief sought outweighs the potential harm to CDS in the absence of such relief, to the extent that sufficient assets would remain in the DIP Accounts such that CDS' security interest would remain adequately protected. Indeed, CDS has conceded that certain funds in the DIP accounts are comprised if "[CareNation's] own operating funds." (Doc. 4 at p. 2 at ¶ 2.) Finally, in the absence of the relief sought, "CareNation's solvency and its ability to pay damages awarded against it at the conclusion of a trial on the merits" would be compromised, which was one of CDS' primary concerns in seeking preliminary injunctive relief.

3. **Notice**. A copy of this expedited motion and a copy of proposed order setting hearing thereon to (1) all parties consenting to electronic service via the Court's CM/ECF system; (2) the office of the United States Trustee via email; (3) Debtor's bankruptcy counsel via email; (4)

counsel of record for CDS Business Services, Inc., d/b/a NEWTEK Business Credit; and (5) counsel of record for Bank of America.

    **4.**    **Suggested Hearing Date.** CareNation requests a hearing upon this motion on Tuesday, September 22, 2020 at 10:30 a.m. C.D.T., or as soon thereafter as possible.

    **5.**    **Supporting Argument.**

        **5.1**    **Stipulation of Facts for purposes of this Motion.**

For the purposes of this Motion, CareNation stipulates to the following facts asserted in CDS' Expedited Motion.

    1.    On March 28, 2019 (the **"Petition Date"**), the Debtor Capstone Pediatrics, PLLC (**"Debtor"**) commenced the underlying bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

    2.    Among its "First Day Motions" was a request by Debtor to obtain "Debtor in Possession" financing (**"DIP Financing"**) from CDS [DE 3], which request was granted first on an interim basis on April 4, 2019 [DE 50], thereafter on a final basis on May 14, 2019 [DE 104], and thereafter ultimately further amended to increase the amount of allowed indebtedness on April 3, 2020 [DE 204] (collectively, the **"DIP Financing Orders"**).

    3.    In order to effectuate certain requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request for permission to continue to use its two existing bank accounts at Bank of America (**"Bank Account and Cash Management Motion"**) [DE 5] – one of which accounts was its payroll account, bearing account no. XXXXXX7579 (**"Payroll Account"**)- and the other of which was its primary operating account, bearing account no. XXXXXX6837 (**"Operating Account"**), the latter of which was subject to automatic daily sweeps in favor of CDS under the terms of the proposed DIP Facility (the **"DIP Facility"**). In addition, Debtor sought permission to open a third account with Bank of America, the sole purpose of which was to hold funds earmarked for professionals retained in the Bankruptcy Case, whose fees were included in the DIP Financing discussed below (the **"Carve-out Account"**) (all of the foregoing referenced accounts of Debtor, including any accounts that may have been subsequently opened post-petition on behalf of Debtor are hereinafter collectively referred to as the "**DIP Accounts**".) This court approved the Bank Account and Cash Management Motion on April 4, 2019 [DE 43].

    4.    In order to effectuate certain other requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request to authorize Debtor's retention of an independent Chief Restructuring Officer and separate Turnaround Advisory Firm, which motion was granted first on an interim basis on April 6, 2019 [DE 56] and thereafter on a final basis on May 17, 2019 [DE 109] (collectively the **"CRO/Turnaround Advisory Firm Retention Order"**).

5. Pursuant to the terms of the CRO/Turnaround Advisory Firm Retention Order, the CRO and Turnaround Advisory Firm were granted the *sole* authority to act on behalf of Debtor with regard to, *inter alia*:

    a. Opening and closing bank accounts for Debtor;
    b. Writing checks for Debtor and transferring funds of Debtor;
    c. Causing Debtor to enforce any of its contractual rights; and
    d. Causing Debtor to comply with all guidelines of the Office of the United States Trustee.

6. On May 19, 2020, Debtor filed a motion to sell certain of its assets and assign certain of its contracts pursuant to 11 U.S.C. §§ 363 and 365 (the "**Sale Motion**") [DE 207].

7. The DIP Facility approved by the DIP Financing Orders matured on June 15, 2020 by its own terms. The balance thereunder became due to CDS immediately, Debtor was obligated to remit to CDS the collected proceeds of all accounts receivable upon receipt per the terms of the approved DIP Facility, and thereafter CDS made no further advances under the DIP Facility, though between June 15 and June 23, 2020, CDS declined to exercise control over, and promptly returned to Debtor, certain "PCMH" advances[2] applied for by Debtor from TennCare, plus an additional approximately $3,700.00 in proceeds received, in order to facilitate Debtor's continued operations until the proposed asset sale could take place.

8. On July 20, 2020, this Court approved the sale of certain of Debtor's assets, and assignment of certain of Debtor's assumed contracts, to CareNation (the "**Asset Sale Order**") [DE 254] as set forth in that certain Asset Purchase Agreement dated July 8, 2020 (the "**APA**") attached thereto.

(Doc. 4 at pp. 3-5.)

**5.2    Additional Facts in support of this Motion.**

1. Debtor filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code on March 28, 2019. This case represents a second Petition by Debtor before this Court, the prior bankruptcy case, Case No. 3:15-bk-09031 having been voluntarily dismissed May 21, 2018, via a structured dismissal. Debtor was not able outside of bankruptcy to effectuate a quick sale or obtain equity infusion, particularly in light of the substantial IRS tax liens. Debtor recognized the sale of assets free and clear of liens in bankruptcy is likely the only option.

2. Debtor was one (1) of the largest independent privately held pediatric practices in the Middle Tennessee region. Its mission was to deliver personalized, quality care to improve and maintain its patients' health and wellbeing. At the time of the filing of this case, Debtor employed 15 medical professionals and had between 25,000 and 35,000 patients. Debtor had locations in the Middle Tennessee area in Clarksville, Antioch and Smyrna. Debtor had contracts with a number of Medicare and Medicaid payers.

3. At the time of filing, Debtor had three (3) bank accounts with Bank of America, Account No. XXXXXXX2194 used as its payroll account ("**Payroll Account**"); Account No.

4
{02112826.5 }
Case 3:20-ap-90140   Doc 16   Filed 09/21/20   Entered 09/21/20 16:03:46   Desc Main
Document     Page 4 of 11

XXXXXXX6837 designating as an operating account into which all payments for Medicare and Medicaid are directed ("**Provider Account**"); and Account No. XXXXXXX6239 an operating account from which Debtor paid its bills and expenses, including vendors and employees ("**Operating Account**").

4.  Pursuant to the Asset Purchase Agreement dated as of July 8, 2020, CareNation purchased the "Acquired Assets," including the name "Capstone Pediatrics," and any and all other tradenames and all assets of any kind whatsoever which are not "Excluded Assets" and which are owned and/or held by Debtor with respect to Debtor's practice. The Acquired Assets included the Medicare number and the Medicaid number which are tied to the tax id number and assumed contracts of Debtor.

5.  At the time of purchase, the only accounts for operating and collection were the Provider Account and the Operating Account. Until such time as CareNation can establish a separate provider payment account and all Medicare and Medicaid payments can be paid to a separate account in the name of CareNation, all Medicare and Medicaid government payments remain directed to the Provider Account. Pursuant to the Asset Purchase Agreement, Debtor is entitled to all accounts receivable as of the closing date of July 20, 2020 ("**Closing Date**"), and CareNation is entitled to all accounts receivable resulting from services rendered and invoices issued after the Closing Date.

6.  For the transition period after closing, Debtor, CDS and CareNation should have negotiated and entered into a transition/management agreement for the processing, invoicing and collection of Debtor's accounts, which services have been and continue to be performed by CareNation with CareNation employees without compensation.

7.  Beginning with closing, CareNation has operated the former practice of Debtor as Capstone Pediatrics, a division of CareNation ("**Capstone Division**"). All employees are treated as employees of the Capstone Division.

8.  CareNation is a Tennessee nonprofit corporation formed in September 2009.

9.  All the paperwork required and necessary to establish a provider account for CareNation takes anywhere from three (3) to four (4) months  CareNation has made application and is pursuing establishment of a provider account in its name. Until that time, all receivables, both preacquisition and post-acquisition, are being processed, managed and collected by CareNation and will continue to be automatically deposited into Debtor's provider Account.

10.  Since execution of the APA and approval of the Asset Sale Order, the Capstone Pediatrics division has continued to provide pediatric medical services on a not-for-profit basis. Capstone Division currently employs 15 medical professionals, including board certified pediatricians and pediatric nurse practitioners. Capstone Division also has a hospitalist program, with two physician hospitalists and two pediatric nurse practitioner hospitalists.

11.  Capstone Division currently provides primary pediatric care for a patient base comprised of approximately 25,000 to 35,000 patients. (Case No. 3:18-bk-1971 at Docket Entry No. 8 at p. 4 ¶ 14.) Capstone Division's areas of specialty include Developmental-Behavioral

5

Pediatrics, Audiology-Diagnostics and Behavioral Health. families in Davidson, Sumner and Montgomery Counties, within the jurisdiction of this Court. Capstone Division's "payor mix" includes TennCare, which provides insurance coverage to a larger number of Capstone Division's patients. Consequently, Capstone Division provides care to indigent patients who, although TennCare beneficiaries, have limited options for pediatric care, as many pediatric practices do not accept TennCare patients.

12. Pursuant to the terms of the DIP Facility, and the approval of the Account and Cash Management Motion on April 4, 2019, CDS was granted the right to conduct automatic daily sweeps of the Operating Account. Upon acquisition of the assets of the Debtor, CareNation made certain disbursements from the DIP Accounts as part of the continuing operations of its medical practice. However, as conceded by CDS, Capstone Division also "deposited the proceeds of Capstone Division accounts receivable in to the Carve-Out Account and paying expenses of Capstone Division from monies deposited into the Carve-Out Account." (Doc. 4 at p. 6 ¶ 13.)

13. In addition to the accounts receivable proceeds mentioned hereinabove, Capstone Division also deposited into the Carve-Out Account the proceeds of a certain loan it received from Bank of America pursuant to the "Paycheck Protection Program" in the amount of $636,386.00 (the "**PPP Loan**"). Capstone Division took out the PPP Loan to fund essential payroll and approved operational costs in the wake of the economic crisis caused by the COVID-19 Pandemic. Capstone Division took out the PPP Loan address its prospective economic needs, not to finance the Debtor's estate or otherwise satisfy any amounts due and owing to CDS by virtue of the DIP Facility. CareNation vigorously disputes the unsupported allegations contained in CDS' "Supplemental Memorandum in Support of Expedited Motion for Preliminary Injunction" as to the PPP Loan, which are of little probity to the issues raised in this Adversary Proceeding.

14. At the time of the filing of CDS' Motion for Preliminary Injunction on September 11, 2020, the DIP Accounts contained certain proceeds that represent cash assets of CareNation earned after the entry of the Sale Order. At the time the Preliminary Injunction was issued on September 18, 2020, CDS had no right, title or interest in the proceeds of the PPP Loan.

15. As stated above, Capstone Division's operations depend greatly on an influx of payments on TennCare medical claims, which are paid by the Center for Medicare and Medicaid Services (**CMS**). CareNation has been advised that, as a successor provider to Debtor, CMS will need approximately two (2) to four (4) months to process TennCare payments on CareNation's outstanding claims. In the interim, CareNation has relied heavily on payments received from other providers and "self-pay" patients within its "payor mix," as well as the proceeds of the PPP Loan, to meet its operating expenses, including payroll for its medical professionals and staff.

16. CareNation is required to meet its next payroll for the Capstone Division effective on the Payroll Date. By operation of the Preliminary Injunction, CareNation has been deprived of all resources necessary to meet the Capstone Division payroll requirements on the Payroll Date, as well as the ability to pay for goods and materials necessary and proper for continued operations. In the absence of the relief sought, Capstone Division and maybe CareNation will be compelled to halt its operations, perhaps permanently. Among other things, a halt in operations would create significant exposure to CareNation, but it will also cause substantial and irreparable

interruptions in medical services to some of the most vulnerable pediatric patients within the Middle District of Tennessee amidst an historic global pandemic.

### 5.3 Legal Standard.

"In considering a motion for preliminary injunction employs a four factor test (1) whether the movant has a likelihood of success on the merits; (2) whether the movant would suffer irreparably injury without the injunction; (3) whether issuance of the injunction would cause potential harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Johnson v. Pritchard*, 2015 WL 4211509 at *1 (M.D. Tenn. filed July 10, 2015) (*citing American Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 354 F.3d 438, 445 (6th Cir.1998)). The moving party must establish that it is entitled to such relief by ***clear and convincing evidence***. *See Deck v. City of Toledo*, 29 F. Supp. 2d 431, 433 (N.D. Ohio 1998) (citing *Garlock, Inc. v. United Seal, Inc.*, 404 F. 2d 256, 257 (6th Cir. 1968)). The Preliminary Injunction issued to CDS is overly broad, and CDS has not established by clear and convincing evidence that it is entitled to relief that would deprive CareNation of revenues actually earned from its operations (and for that matter, the PPP Loan Proceeds) that were deposited into the DIP Accounts.

### 5.4 CDS has not shown that it is likely to succeed on the merits of its claims for damages, and in fact, has conceded that CareNation is likely to establish ownership of certain cash assets currently deposited into the DIP Account.

CareNation has assented to the Preliminary Injunction to the extent it prohibits CareNation's access to or use of the DIP Accounts in the name of the Debtor. But as CDS concedes, certain funds in the DIP Accounts are cash assets duly earned by or disbursed to CareNation which it is entitled to withdraw. (Doc. 4 at p. 8 ("any monies to which [CareNation] is entitled may be remitted to an appropriate bank account of CareNation in very short order").) In any event, CDS has failed to establish by clear and convincing evidence the scope of its secured interest in the DIP Accounts, estimated by CDS to range between "an amount not less than $120,000.00" and approximately $204,000.00. (Doc. 1 at p. 10 ¶ 43.) Nor has CDS established by clear and convincing evidence that it is entitled to treble damages under Tenn. Code Ann. § 47-50-109 or punitive damages. (Id. at p.9 ¶ 39 and p. 11 at ¶ (2).) Thus, while CareNation has stipulated to the Preliminary Injunction in terms of use and access of the DIP Accounts, CDS has not established that it is likely to succeed on the merits of its claims for damages. At a minimum, then. CareNation is entitled to the relief sought, i.e., a Payroll Disbursement from the DIP Accounts equal to the Payroll Amount.

### 5.5 CDS is not likely to suffer irreparable harm if the limited relief sought by CareNation is granted.

"At the preliminary injunction stage, 'irreparable harm consists of harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits.'" *Malibu Boats, LLC v. Nautique Boat Co., Inc.* 997 F. Supp. 2d 866, 885 (E.D. Tenn. 2014) (*citing Canon, Inc. v. GCC Int'l, Ltd.,* 263 Fed.Appx. 57, 62 (Fed.Cir.2008). Moreover, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the

ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)) The only irreparable harm cited by CDS was the allegation that CareNation was "circumventing the standing sweep order on the DIP Operating Account in order to get CDS' money presumably to use in its own operations." (Doc. 4 at p. 14.) The use and access restrictions contained in the Preliminary Injunction are adequate to protect against the harm alleged by CDS.

CDS further alleged that "CareNation commingle[d] its own money with that of CDS every day" before issuance of the Preliminary Injunction. (*Id.*) As a result, CDS asserts that an accounting will be necessary to ascertain entitlement to the funds. (*Id.* at p. 8.) Thus, CDS has conceded that it is at least likely that CareNation is entitled to some portion of the funds on deposit in the DIP Accounts, which may include, but are not limited to, the PPP Loan proceeds.[1]

Admittedly, a creditor with a collateral interest in certain cash assets may be able to establish irreparable harm or otherwise obtain a preliminary injunction to prevent disposition of its collateral. *In re Universal Builders, Inc.,* 53 B.R. 183, 186 (issuing preliminary injunction to surety of construction company for retainage payments). However, such injunctive relief is not granted beyond the scope of the creditor's interest. *Id.* Here, CDS asserts a secured interest in funds that CareNation has allegedly converted from the DIP Accounts in an amount not less than $120,000.00. The Preliminary Injunction, which prohibits CareNation from accessing actual funds in the DIP Accounts to which it is entitled, exceeds the scope of the claimed irreparable harm, which although compensable by money damages, would amount to approximately $120,000.00 according to the Complaint.

### 5.6 The harm to be incurred by CareNation and other parties in the absence of the limited relief sought will be substantial.

If the limited relief from the Preliminary Injunction is not granted, the harm to CareNation and third parties will be substantial, irreparable, and perhaps, irreversible. Due to the delay in receipt of TennCare payments, in the near term, CareNation needs to rely on its revenues from the other segments of its "payor mix" to fund payroll and operating costs. If the relief sought in this Motion is not granted, and CareNation does not receive a Payroll Disbursement, CareNation will not be able to make payroll and it will be compelled to close immediately. This will cause serious legal and compliance issues for CareNation, if its providers and staff are not paid for work performed and medical care is interrupted. It could also place its standing as a qualified CMS provider in peril.

---

[1] CDS alleges that CareNation and/or its officers engaged in improprieties in the PPP Loan process. CDS has no standing to assert such claims, nor does CDS have a security interest in those funds. These matters are being addressed by CareNation with the lender, Bank of America. But there would be no irreparable harm to CDS if CareNation were allowed access to the PPP Loan proceeds, to the extent that compensatory relief is available during or after litigation of this matter. *Malibu Boats*, 997 F. Supp. at 885.

8

The harm in the absence of limited relief extends well beyond CareNation:

- CareNation's medical providers could face exposure to patient abandonment claims, which impact their licensure status.

- Capstone Division's staff, including non-exempt hourly employees, would not receive earned pay during a time of economic crisis, and may either be separated from employment or resign their employment – no less a "devastating burden" than the Debtor would have suffered in the absence of the relief it sought in its "First Day Motions."  ((Case No. 3:18-bk-1971 at Docket Entry No. 8 at p. 9 ¶ 15(D)).)

- Tens of thousands of children, many of whom have chronic medical conditions or are members of underserved communities, will be denied essential medical services, and in many cases, inpatient hospital care.

CareNation respectfully submits that the harm to CareNation and other parties in the absence of the relief sought is far greater than the harm to CDS, whose secured interest in the DIP Accounts has not been fully accounted for, if such relief is granted.

### 5.7  Public policy strongly favors the limited relief sought.

The Tennessee Supreme Court has declared that "having a greater number of physicians practicing in a community benefits the public by providing greater access to health care." *Murfreesboro Med. Clinic v. Udom,* 166 S.W.3d 674, 679 (Tenn. 2006) (reversed on other grounds by statute).  This public policy is especially critical during a COVID-19 pandemic.  the effect of the Preliminary Injunction would be to interrupt, or terminate, CareNation's provision of medical services to tens of thousands of children in need.  Under these circumstances, public policy considerations strongly support the limited relief sought by CareNation.

**6.** **Conclusion.** CareNation simply seeks limited relief from the Preliminary Injunction in the form of a Payroll Disbursement from the DIP Accounts equal to the Payroll Amount to continue operations, specifically, medical treatment of vulnerable infants, children and teens. The Preliminary Injunction would continue to protect the interests of CDS and other interested parties if such relief were granted. Denying such relief would cause tremendous harm and obstruct the goals of a successful reorganization premised in no small part on continuation of medical care. CareNation therefore prays that this Expedited Motion be **GRANTED**, and that the Payroll Disbursement be disbursed to CareNation immediately upon entry of the appropriate Order.

Respectfully submitted,

**BONE McALLESTER NORTON PLLC**

*/s/ Sam J. McAllester III*
Sam J. McAllester III, #03461
William J. Haynes III, #17398
511 Union Street, Suite 1600
Nashville, Tennessee 37219
(615) 238-6300 Phone
(615) 238-6301 Facsimile
Email:  smcallester@bonelaw.com
   whaynes@bonelaw.com

*Attorney for America Cares Trust, d/b/a CareNation*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically on September 21, 2020. Notice of this filing was sent by operation of the Court's electronic filing system to all those parties specifically requesting electronic service and as indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. In addition, notice was sent in the manner set forth in section 3, above.

Daniel H. Puryear
Puryear Law Group PLLC
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205
*Counsel for the Plaintiff,*
*CDS Business Services, Inc.*
*d/b/a Newtek Business Credit*

David W. Houston IV
Burr & Forman LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
dhouston@burr.com
*Counsel for Capstone Pediatrics, PLLC*

Daniel Fleming
Wong Fleming
821 Alexander Road, Suite 200
Princeton, NJ 08540
dfleming@wongfleming.com
*Counsel for Bank of America, NA*

Megan Seliber
Office of the U.S. Trustee, Trial Attorney
318 Customs House, 701 Broadway
Nashville, TN 37203
megan.seliber@usdoj.com
*Counsel for the United States Trustee*

                                            */s/Sam J. McAllester III*
                                            Sam J. McAllester III