# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 3:19-bk-1971 |
| **CAPSTONE PEDIATRICS, PLLC,** | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **CDS BUSINESS SERVICES, INC.** | ) | |
| **d/b/a NEWTEK BUSINESS CREDIT,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 3:20-ap-90140 |
| | ) | |
| **AMERICA CARES TRUST d/b/a** | ) | |
| **CARENATION,** | ) | |
| | ) | |
| Defendant. | ) | |

_____

**AMERICA CARES TRUST d/b/a CARENATION'S
THIRD EXPEDITED MOTION AND SUPPORTING MEMORANDUM FOR RELIEF
FROM PRELIMINARY INJUNCTION AND REQUEST FOR FED R. BANKR. P. 7016
CONFERENCE**
_____

Pursuant to Rules 7065 and 7016(b)(3) of the Federal Rules of Bankruptcy Procedure, and Rule 9075-1 of the Local Rules of this Court, Defendant America Cares Trust, Inc., a Tennessee not for profit corporation doing business as CareNation (hereinafter "**CareNation**"), by and through the undersigned counsel, respectfully submits this Third Expedited Motion for Relief from the "Agreed Order Granting Expedited Motion for Preliminary Injunction" (Docket Entry 12) (hereinafter the "**Preliminary Injunction**") upon the Expedited Motion of Plaintiff, CDS Business Services, Inc. doing business as Newtek Business Credit (hereinafter "**CDS**") for Preliminary Injunction (Docket Entry 4) in the above-styled proceeding.

CareNation further requests that this Court set a status conference to discuss (1) disbursement of the remaining proceeds that represent cash assets of CareNation earned after the entry of the Asset Sale Order (hereinafter the "**CareNation Proceeds**") from that certain Bank of America account in the name of the Debtor bearing account number XXXXXXX837 (the

1

"**Provider Account**" (also as defined hereinbelow); (2) transfer of the Provider Account to CareNation; and/or (3) modification of the December 23, 2020 Agreed Scheduling Order.

1. **Expedited Relief Requested.** The Preliminary Injunction reads in pertinent part:

> America Cares Trust (ACT), d/b/a CareNation, its agents (specifically including, but not limited to, Michael Gaw), and any party acting in concert with CareNation, are enjoined, pending further order of this court, from accessing, depositing into, withdrawing from, viewing, using, transferring into or out of, encumbering, or preventing access of Debtor Capstone Pediatrics, PLLC ("Debtor") to any of Debtor's DIP Accounts used or opened at any time in this case including, but not limited to, those certain Bank of America accounts in the name of Debtor bearing account numbers XXXXXXX837, XXXXXXX7579 and XXXXXXX239. In addition, and immediately upon entry of this Order, Michael Gaw of CareNation shall ensure that all checks to any of Debtor's DIP Accounts are immediately turned over to Jim Davis, Chief Restructuring officer for Debtor, at such location as Davis may direct to CareNation and/or Gaw.

CareNation moves this Court to enter an expedited order, or otherwise to conduct an expedited hearing, to Order:

> (i) disbursement of an amount not less than $215,253.59 on deposit in the Provider Account. The disbursement sought from the Provider Account constitute CareNation Proceeds for services rendered from July 21, 2020 to September 21, 2020 (July 21, 2020 through September 21, 2020 being the "**Phase I Accounting Period**").

> (ii) That CDS remit to CareNation the amount of $39,771.73 as a repayment of CareNation Proceeds deposited in the Provider Account during the Phase I Accounting Period that were withdrawn by CDS during the Phase I Accounting Period.

CareNation submits that CDS does not dispute CareNation's calculations supporting this request, after an accounting and reconciliation completed by the parties for the Phase I Accounting Period (such accounting and reconciliation process the "**Phase I Accounting**")

CareNation also requests a Fed. R. Bankr. P. 7016 conference to discuss: (1) disbursement of the remaining amounts of CareNation Proceeds from the Provider Account; (2) transfer of the Provider Account to CareNation; and/or (3) modification of the December 23, 2020 Agreed Scheduling Order.

**2. Need for Expedited Order.** CareNation requires the limited relief from the Preliminary Injunction to ensure that there is no continued interruption of essential medical services to its pediatric patients, many of whom are infants, children and teens with chronic medical conditions requiring continuous and/or immediate treatment. The relief sought would enable CareNation to make its current payroll and ensure medical services are not interrupted or halted altogether. In the absence of injunctive relief, CareNation's patient base would be immediately and perhaps irreparably impacted, and CareNation's medical professionals could be exposed to significant professional liability.

The need for the relief sought outweighs the potential harm to CDS in the absence of such relief, to the extent that sufficient assets would remain in the DIP Accounts such that CDS' dwindling security interest would remain adequately protected. Neither the Debtor nor CDS have right, title or interest in CareNation's PPP Loan funds, proceeds from accounts receivable for services rendered by CareNation on July 21, 2020 and thereafter, or CareNation's accounts receivable.

**3. Notice**. A copy of this expedited motion and a copy of proposed order setting hearing thereon to (1) all parties consenting to electronic service via the Court's CM/ECF system; (2) the office of the United States Trustee via email; (3) Debtor's bankruptcy counsel via email; (4) counsel of record for CDS Business Services, Inc., d/b/a NEWTEK Business Credit; (5) counsel of record for Bank of America; and (6) Michael Gigandet, Trustee.

**4. No Hearing Will Be Required/Requested Hearing Date If Deemed Necessary.** CareNation does not believe an expedited hearing is necessary for the reasons set forth below. In the event a hearing is necessary, requests a hearing upon this motion on Thursday, January 7, 2021 at 10:30 a.m. C.D.T., or as soon as possible before or after said date. **CareNation submits that January 12, 2021 will not be a practicable date for such a hearing.**

**5. Supporting Argument.**

**5.1 Stipulation of Facts for purposes of this Motion.**

Solely for the purposes of this Motion, CareNation stipulates to the facts asserted in Section 5.1, Paragraphs 1 through 8, of CDS' Expedited Motion for Preliminary Injunction (Docket Entry 4), which are incorporated by reference as if fully restated herein.

**5.2 Additional Facts in support of this Motion.**

1. Debtor filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code on March 28, 2019. This case represents a second Petition by Debtor before this Court, the prior bankruptcy case (Case No. 3:15-bk-09031) having been voluntarily dismissed May 21, 2018, via a structured dismissal. Debtor was not able outside of bankruptcy to effectuate a quick sale or obtain equity infusion, particularly considering the substantial IRS tax liens. Debtor recognized the sale of assets free and clear of liens in bankruptcy was likely the only option.

2. Debtor was one (1) of the largest independent privately held pediatric practices in the Middle Tennessee region. Its mission was to deliver personalized, quality care to improve and

maintain its patients' health and wellbeing. At the time of the filing of this case, Debtor employed 15 medical professionals and had between 25,000 and 35,000 patients. Debtor had locations in the Middle Tennessee area in Clarksville, Antioch and Smyrna. Debtor had contracts with several Medicare and Medicaid payers.

3. At the time of filing, Debtor had three (3) bank accounts with Bank of America, Account No. XXXXXXX2194 used as its payroll account ("**Payroll Account**"); Account No. XXXXXXX837 designating as an operating account into which all payments for Medicare and Medicaid are directed (the Provider Account); and Account No. XXXXXXX239 an operating account from which Debtor paid its bills and expenses, including vendors and employees ("**Operating Account**").

4. Pursuant to the Asset Purchase Agreement dated as of July 8, 2020 (hereinafter referred to as the "**APA**"), CareNation purchased the "Acquired Assets," including the name "Capstone Pediatrics," and any and all other tradenames and all assets of any kind whatsoever which are not "Excluded Assets", and which are owned and/or held by Debtor with respect to Debtor's practice. The Acquired Assets included the Medicare number and the Medicaid number which are tied to the tax id number and assumed contracts of Debtor.

5. At the time of purchase, the only accounts for operating and collection were the Provider Account and the Operating Account. Until such time as CareNation can establish a separate provider payment account and all Medicare and Medicaid payments can be paid to a separate account in the name of CareNation, all Medicare and Medicaid government payments remain directed to the Provider Account. Pursuant to the Asset Purchase Agreement, Debtor is entitled to all accounts receivable as of the closing date of July 20, 2020 ("**Closing Date**"), and CareNation is entitled to all accounts receivable resulting from services rendered and invoices issued after the Closing Date.

6. For the transition period after closing, CareNation and the CRO had an agreement allowing CareNation use of the Provider Account and Operating Account. In hindsight, rather than rely on the informal agreement for the transition period, Debtor, CDS and CareNation should have negotiated and entered into a written transition/management agreement for the processing, invoicing and collection of Debtor's accounts, which services have been and continue to be performed by CareNation with CareNation employees without compensation.

7. Beginning with closing, CareNation has operated the former practice of Debtor as Capstone Pediatrics, a division of CareNation ("**Capstone Division**"). All employees are treated as employees of the Capstone Division.

8. CareNation is a Tennessee nonprofit corporation formed in September 2009.

9. All the paperwork required and necessary to cause payors to redirect payments to CareNation's own provider account takes anywhere from three (3) to four (4) months to complete. Prior to the closing of the APA, CareNation made requests to payors to redirect their remittances from the Provider Account to a new provider account in the name of CareNation. Shortly after the Closing Date, CareNation made application for a provider account in its name, which has

4
{02161921.5 }
Case 3:20-ap-90140  Doc 59  Filed 01/05/21  Entered 01/05/21 17:34:23  Desc Main
Document    Page 4 of 12

since been opened. But despite CareNation's best efforts, several payors that process, manage and remit receivables, have continued to deposit all such receivables into the Provider Account.

10. Since execution of the APA and approval of the Asset Sale Order, the Capstone Division has continued to provide pediatric medical services on a not-for-profit basis. Capstone Division currently employs 15 medical professionals, including board certified pediatricians and pediatric nurse practitioners. Capstone Division also has a hospitalist program, with two physician hospitalists and two pediatric nurse practitioner hospitalists.

11. Capstone Division currently provides primary pediatric care for a patient base comprised of approximately 25,000 to 35,000 patients. (Case No. 3:19-bk-1971 at Docket Entry No. 8 at p. 4 ¶ 14.) Capstone Division's areas of specialty include Developmental-Behavioral Pediatrics, Audiology-Diagnostics and Behavioral Health. Capstone Division's "payor mix" includes TennCare, which provides insurance coverage to a larger number of Capstone Division's patients. Consequently, Capstone Division provides care to indigent patients who, although TennCare beneficiaries, have limited options for pediatric care, as many pediatric practices do not accept TennCare patients.

12. Pursuant to the terms of the DIP Facility, and the approval of the Account and Cash Management Motion on April 4, 2019, CDS was granted the right to conduct automatic daily sweeps of the Operating Account. Upon acquisition of the assets of the Debtor, CareNation made certain disbursements from the DIP Accounts as part of the continuing operations of its medical practice. However, as conceded by CDS, Capstone Division also "deposited the proceeds of Capstone Division accounts receivable in to the [Operating] Account and paying expenses of Capstone Division from monies deposited into the [Operating] Account." (Docket Entry 4 at p. 6 ¶ 13.)

13. In addition to the accounts receivable proceeds mentioned hereinabove, Capstone Division also deposited into the Operating Account the proceeds of a certain loan it received from Bank of America pursuant to the "Paycheck Protection Program" in the amount of $636,386.00 (the "**PPP Loan**"). Capstone Division took out the PPP Loan to fund essential payroll and approved operational costs in the wake of the economic crisis caused by the COVID-19 Pandemic. Capstone Division took out the PPP Loan to address its prospective economic needs, not to finance the Debtor's estate or otherwise satisfy any amounts due and owing to CDS by virtue of the DIP Facility. CareNation vigorously disputes the unsupported allegations contained in CDS' "Supplemental Memorandum in Support of Expedited Motion for Preliminary Injunction" as to the PPP Loan (Docket Entry 10), which are of little probity to the issues raised in this Adversary Proceeding. The Debtor has claimed no interest in the PPP Funds.

14. At the time of the filing of CDS' Motion for Preliminary Injunction on September 11, 2020, the DIP Accounts contained a substantial amount of CareNation Proceeds. At the time the Preliminary Injunction was issued, CDS had no right, title or interest in the CareNation Proceeds or the proceeds of the PPP Loan.

15. As stated above, Capstone Division's operations depend greatly on an influx of payments on TennCare medical claims, which are paid by the Center for Medicare and Medicaid Services (**CMS**). CareNation was advised that, as a successor provider to Debtor, CMS will need

5

approximately two (2) to four (4) months to redirect TennCare payments on CareNation's outstanding claims. Since the entry of the Preliminary Injunction, CareNation has relied heavily on payments received from other providers and "self-pay" patients within its "payor mix," as well as the proceeds of the PPP Loan, to meet its operating expenses, including payroll for its medical professionals and staff.

16. Through two separate Orders, the Court has modified the Preliminary Injunction to release funds constituting PPP Loan proceeds from the DIP Accounts. On September 23, 2020, this Court entered an Agreed Order Modifying Preliminary Injunction which authorized Bank of America to "to issue from the remaining balance in Account XXXXXXX239 a cashier's check in the amount of Seventy-Two Thousand and 00/100 Dollars ($72,000.00), which the parties agreed "reflect[ed] a portion of the funds" from the PPP Loan CareNation obtained from Bank of America. (Docket Entry 26 p. 2 ¶¶ 1-2.) Then on October 30, 2020, this Court entered a second Agreed Order Modifying Preliminary Injunction which authorized Bank of America "to issue from the remaining balance in Account XXXXXXX239 a wire transfer in the amount of all remaining proceeds" to CareNation, as "neither CDS nor Debtor claim any interest in [such] residual balance." (Docket Entry 49 at p. 2 ¶ 1.)

17. Despite these limited PPP Loan disbursements, by operation of the Preliminary Injunction, CareNation has been deprived of access to CareNation Proceeds. As this Court well knows, necessary to meet the Capstone Division's operating expenses and payroll obligations. Without its post-closing accounts receivable, Capstone Division has been compelled to close not less than two (2) office locations. The situation is so dire that Capstone Division and maybe CareNation will be compelled to halt its operations, perhaps permanently. Among other things, a halt in operations would create significant exposure to CareNation, but it will also cause substantial and irreparable interruptions in medical services to some of the most vulnerable pediatric patients within the Middle District of Tennessee amidst an historic global pandemic.

18. As of December 31, 2020, the Provider Account contained total proceeds of $519,570.69. The Parties to this Adversary Proceeding have worked in good faith to collaborate on an accounting and reconciliation of the DIP Accounts to determine the parties' respective ownership rights in proceeds of accounts receivable deposited into the DIP Accounts since the closing of the sale contemplated by the Asset Purchase Agreement (APA) between the Debtor and the Defendant on July 20, 2020 (the "**Accounting and Reconciliation**"). Upon Motion filed by the Parties (Case No. 3:19-bk-1971 Docket Entry 309); this Court entered an Agreed Scheduling Order on December 23, 2020 that stated, in pertinent part, as follows:

> 1. **Phasing of Accounting and Reconciliation.** The phases for the Accounting and Reconciliation are as follows:
>
> (a) **Phase I:** Phase 1 covers the period beginning after the Closing Date (July 21, 2020) and ending on the last day of the month after the entry of the Order Granting Expedited Relief from the Preliminary Injunction (September 30, 2020).
>
> \* \* \*
>
> 2. **Phase I:** As evidenced by the signatures of counsel below, all Initial Disclosures for Phase I have been completed and CareNation has provided CDS

6

with its claim of entitlement to a specified portion of the Phase I funds. Pursuant to the process set forth in the Protective Order, the parties shall meet and confer to validate and authenticate the data contained in the Initial Disclosures on December 18, 21 and 22, 2020 for not less than 8 hours a day each day, unless the parties agree in writing to a shorter number of days or total hours. Assuming that CDS has been afforded full access through CareNation to the payor portals for viewing such unredacted initial disclosures over the course of these days, CDS shall provide CareNation with its conclusion as to the amounts of money collected during the Phase I time period which is attributable to services provided by Capstone prior to the APA closing, and services provided by CareNation after the APA closing on or before December 31, 2021.

(3:19-bk-1971 Docket Entry 313 pp. 2, 3.) While the parties initially intended that Phase I period of the Accounting and Reconciliation would extend through September 30, 2020, the Phase I Accounting only covered the period beginning July 21, 2020 through September 21, 2020.

19. In its Complaint, CDS alleges that, beginning on or before August 14, 2020, CareNation began withdrawing funds from the DIP Accounts prior to CDS' scheduled automatic daily sweeps, "preventing CDS from being paid in accordance with the DIP Facility and DIP Financing Orders." (Docket Entry 1 at p. 5 ¶ 18.) At the time of the filing of this action, CDS alleged that its damages (the amounts due and owing to CDS that were withdrawn from the DIP Accounts by CareNation) were "not less than $120,000.00." (Id. at p. 8 ¶ 33.) In the Court's September 23, 2020 Agreed Order Modifying Preliminary Injunction, the Court further ordered that an additional $204,928.67 be transferred from Bank of America Account XXXXXXXX239 to the Provider Account, as those funds represented :"proceeds of accounts receivable . . . improperly directed" from the Provider Account to Account XXXXXXXX239. That transfer was defined in the Court's Order and will be defined hereafter as the "**837 Transfer**"). (Docket Entry 49 at p. 2 ¶ 1.)

20. For its part, after the Adversary Proceedings were filed, CareNation conducted its own accounting and reconciliation of DIP Account Activity, and determined as follows:

   a. That during Phase I Accounting Period, proceeds of accounts receivable totaling $333,088.87 were deposited into the DIP Accounts.

   b. That not less than $255,000.00 of proceeds deposited into the DIP Accounts during the Phase I Accounting Period constituted CareNation Proceeds due and owing to CareNation;

   c. That between July 20, 2020 and August 10, 2020, CDS collected approximately $117,832.58 from automatic daily sweeps from the Operating Account and/or other DIP accounts; and

   d. That CDS was entitled to only $78,098.70 of proceeds deposited into the DIP Accounts during the Phase I Accounting Period, as such amount constituted

7

proceeds of accounts receivable for services rendered by Debtor prior to the closing of the APA during the Phase I Accounting Period; and

e. CDS received $39,771.73 in CareNation Proceeds during the Phase I Accounting Period, and should be required to return such overpayment to CareNation.

As a result, CareNation filed an Answer and Counterclaim alleging conversion and recovery of those funds CDS swept in excess of what CDS was actually owed between July 20, 2020 and August 10, 2020 (Docket Entry 51; *see also* Docket Entry 54 (Amended Answer and Counterclaim).)

21. Against this backdrop, the Parties timely completed the Phase I Accounting in accordance with the Agreed Scheduling Order. Also pursuant to the Agreed Scheduling Order, on December 31, 2020, CDS counsel advised the undersigned counsel for CareNation that CDS does not dispute CareNation's Phase I calculations the amounts collected during the Phase I Accounting Period attributable to services provided by the Debtor prior to the APA closing, and services provided by CareNation after the APA closing.

22. By its own admission, CDS has likely rendered its Adversary Proceeding subject to dismissal. CDS has conceded that the amount of funds owed to it during a time period spanning Phase I was $78,060.84, far less than the amount it estimated it was due and owing at the time the Adversary Proceedings, and far less than the amount it swept from the Provider Account during the Phase I Accounting Period. CDS has further stipulated that $255,025.03 in Phase I CareNation Proceeds are no longer subject to injunction.

23. CareNation's preliminary accounting for the period beginning September 26, 2020 through October 31, 2020, which covers the "Phase II" period outlined in the Agreed Scheduling Order, shows that accounts receivable proceeds totaling $189,811.79 were deposited into the Provider Account during that period. Of those deposits, $187,965.87 constituted CareNation Proceeds, and $1,845.92 constituted proceeds of Debtor's accounts receivable due to CDS. Based upon the outcome of Phase I Accounting, it is highly likely that CareNation's Phase II accounting is accurate, and subsequent accounting and reconciliation phases will show that all or substantially all of the amounts remaining in the DIP Accounts are the property of CareNation.

### 5.3 Legal Standard.

"In considering a motion for preliminary injunction employs a four factor test (1) whether the movant has a likelihood of success on the merits; (2) whether the movant would suffer irreparably injury without the injunction; (3) whether issuance of the injunction would cause potential harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Johnson v. Pritchard*, 2015 WL 4211509 at *1 (M.D. Tenn. filed July 10, 2015) (*citing American Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 354 F.3d 438, 445 (6th Cir.1998)). The moving party must establish that it is entitled to such relief by **clear and convincing evidence**. *See Deck v. City of Toledo*, 29 F. Supp. 2d 431, 433 (N.D. Ohio 1998) (citing *Garlock, Inc. v. United Seal, Inc.*, 404 F. 2d 256, 257 (6th Cir. 1968)) (emphasis added).

### 5.4 CDS will not succeed on the merits of its claims for damages, or otherwise, because it has no right, title or interest in the funds representing CareNation Proceeds of Accounts Receivable sought by this Motion.

Phase I of the Accounting and Reconciliation process has shown that CDS is now unlikely to succeed on the merits of its litigation. CDS now agrees with CareNation's calculations, and there is no dispute that the funds sought by CareNation in this Motion are CareNation Proceeds. Moreover, as stated in prior Motions, CDS has no right, title or interest in the CareNation's Accounts Receivable, or the proceeds of the PPP Loan, all of which CareNation obtained after the sale of the Debtor's assets. Those CareNation Proceeds were deposited in anticipation of funding the continued operations and payroll obligations of the Capstone Division. CDS has no basis to object to CareNation's access to the funds sought in this Motion, and it is likely that subsequent phases of the Accounting and Reconciliation will show that it has scant, if any, interest in <u>any</u> of the amounts on deposit in any of the DIP Accounts.

### 5.5 CDS will suffer no irreparable harm if the limited relief sought by CareNation is granted.

Based upon the legal and factual reasons stated in its first Motion for Limited Relief (Docket Entry 16 pp. 7-8 ¶ 5.5), CareNation does not believe that CDS can establish irreparable harm if the relief sought is granted. A creditor with a collateral interest in certain cash assets may be able to establish irreparable harm or otherwise obtain a preliminary injunction to prevent disposition of its collateral. *In re Universal Builders, Inc.,* 53 B.R. 183, 186 (Bankr. M.D. Tenn. 1985) (issuing preliminary injunction to surety of construction company for retainage payments). However, such injunctive relief is not granted beyond the scope of the creditor's interest. *Id.* CDS now concedes that it has no right, title or interest in the amounts sought by CareNation here. CDS has no basis to further delay CareNation's access to the funds it seeks in this Motion.

### 5.6 The harm to be incurred by CareNation and other parties in the absence of the limited relief sought will be substantial.

If the limited relief from the Preliminary Injunction is not granted, the harm to CareNation and third parties will be substantial, irreparable, and perhaps, irreversible. Due to the delay in receipt of TennCare payments, in the near term, CareNation needs to rely on its revenues from the other segments of its "payor mix" to fund payroll and operating costs. If the relief sought in this Motion is not granted, and CareNation is not allowed access to its ***own money***, CareNation will be compelled to cease operations. This will cause serious legal and compliance issues for CareNation, if its providers and staff are not paid for work performed and medical care is interrupted. It could also place its standing as a qualified CMS provider in peril.

The harm in the absence of limited relief extends well beyond CareNation:

- CareNation's medical providers could face exposure to patient abandonment claims, which impact their licensure status.

9

- Capstone Division's staff, including non-exempt hourly employees, would not receive earned pay during a time of economic crisis, and may either be separated from employment or resign their employment – no less a "devastating burden" than the Debtor would have suffered in the absence of the relief it sought in its "First Day Motions." ((Case No. 3:18-bk-1971 at Docket Entry No. 8 at p. 9 ¶ 15(D).)

- Tens of thousands of children, many of whom have chronic medical conditions or are members of underserved communities, will be denied essential medical services, and in many cases, inpatient hospital care.

CareNation respectfully submits that the harm to CareNation and other parties in the absence of the relief sought is far greater than the harm to CDS, whose secured interest in the DIP Accounts has dwindled rapidly and does not extend to the funds CareNation seeks in this Motion, the CareNation Proceeds or the PPP Loan proceeds at issue in this motion.

### 5.7 Public policy strongly favors the limited relief sought.

The Tennessee Supreme Court has declared that "having a greater number of physicians practicing in a community benefits the public by providing greater access to health care." *Murfreesboro Med. Clinic v. Udom,* 166 S.W.3d 674, 679 (Tenn. 2006) (reversed on other grounds by statute). This public policy is especially critical during a COVID-19 pandemic. The effect of the Preliminary Injunction would be to interrupt, or terminate, CareNation's provision of medical services to tens of thousands of children in need. Under these circumstances, public policy considerations strongly support the limited relief sought by CareNation.

**6. Conclusion.** CareNation asks this Court to relax the injunction to obtain funds proven through Phase I of the Accounting and Reconciliation to be CareNation Proceeds. The relief sought would allow CareNation to continue operations, specifically, medical treatment of vulnerable infants, children and teens. The Preliminary Injunction would continue to protect the dwindling interests of CDS and other interested parties if such relief were granted. Denying such relief would cause tremendous harm and obstruct the goals of a successful reorganization premised in no small part on continuation of medical care.

CareNation therefore prays that this Expedited Motion be **GRANTED**, and that upon entry of the appropriate Order, that (i) CareNation proceeds in the amount of $$215,253.59 be disbursed to CareNation immediately from the Provider Account by the Chief Reconstruction Officer, and (ii) CDS be required to repay CareNation $39,771.73 in CareNation Proceeds swept from the Provider Account during the Phase I Accounting Period. CareNation further prays that this Court set a Fed. R. Bankr. P. 7016 conference to address (1) disbursement of the remaining CareNation Proceeds from the Provider Account; (2) transfer of the Provider Account to CareNation; and/or (3) modification of the December 23, 2020 Agreed Scheduling Order.

A proposed expedited order is attached hereto as **Exhibit 1**, in accordance with LBR 9075-1(c).

Respectfully submitted,

**BONE McALLESTER NORTON PLLC**

*/s/ William J. Haynes, III*
Sam J. McAllester III, #03461
William J. Haynes III, #17398
511 Union Street, Suite 1600
Nashville, Tennessee 37219
(615) 238-6300 Phone
(615) 238-6301 Facsimile
Email:  smcallester@bonelaw.com
    whaynes@bonelaw.com

*Attorney for America Cares Trust, d/b/a CareNation*

11

{02161921.5 }
Case 3:20-ap-90140    Doc 59    Filed 01/05/21    Entered 01/05/21 17:34:23    Desc Main
Document    Page 11 of 12

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically on January 5, 2021. Notice of this filing was sent by operation of the Court's electronic filing system to all those parties specifically requesting electronic service and as indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. In addition, notice was sent in the manner set forth in section 3, above.

Daniel H. Puryear
Puryear Law Group PLLC
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205
dpuryear@puryearlawgroup.com
*Counsel for the Plaintiff,*
*CDS Business Services, Inc.*
*d/b/a Newtek Business Credit*

David W. Houston IV
Burr & Forman LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
dhouston@burr.com
*Counsel for Capstone Pediatrics, PLLC*

Daniel Fleming
Wong Fleming
821 Alexander Road, Suite 200
Princeton, NJ 08540
dfleming@wongfleming.com
*Counsel for Bank of America, NA*

Megan Seliber
Office of the U.S. Trustee, Trial Attorney
318 Customs House, 701 Broadway
Nashville, TN 37203
megan.seliber@usdoj.com
*Counsel for the United States Trustee*

Michael Gigandet, Trustee
Law Office of Michael Gigandet
208 Centre Street
Pleasant View, TN 37146
michael@mgigandet.com

    */s/William J. Haynes, III* _____
    William J. Haynes, III

12
{02161921.5 }
Case 3:20-ap-90140    Doc 59    Filed 01/05/21    Entered 01/05/21 17:34:23    Desc Main
Document    Page 12 of 12