IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 3:19-bk-1971 |
| CAPSTONE PEDIATRICS, PLLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| CDS BUSINESS SERVICES, INC. d/b/a | ) | |
| NEWTEK BUSINESS CREDIT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 3:20-ap-90140 |
| | ) | |
| | ) | |
| AMERICA CARES TRUST (ACT) d/b/a | ) | |
| CARENATION | ) | |
| | ) | |
| Defendant. | ) | |

AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES

Comes now the Plaintiff CDS Business Services, Inc. d/b/a Newtek Business Credit (hereinafter, "**CDS**") by and through counsel, pursuant to Fed. R. Bank. Proc. 7001, 7015 and 7065 and files this amended and supplemental complaint against America Cares Trust (ACT) d/b/a CareNation ("**CareNation**"). In support thereof, CDS states as follows:

**I.      JURISDICTION**

1. This court may exercise personal jurisdiction over CareNation because it is a Tennessee nonprofit corporation that previously entered an appearance in this bankruptcy case and in this adversary proceeding, and expressly consented to the jurisdiction of this court to resolve any disputes related to the asset purchase agreement discussed herein.

2. This Court has original subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b), and by prior order of this Court. [Doc. 254].

3. Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

4. This case is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. BACKGROUND

5. On March 28, 2019 (the **"Petition Date"**), the Debtor Capstone Pediatrics, PLLC (**"Debtor"**) commenced the underlying bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6. Among its "First Day Motions" was a request by Debtor to obtain "Debtor in Possession" financing (**"DIP Financing"**) from CDS [Case No. 3:19-bk-1971, DE 3], which request was granted first on an interim basis on April 4, 2019 [Case No. 3:19-bk-1971, DE 50], thereafter on a final basis on May 14, 2019 [Case No. 3:19-bk-1971, DE 104], and thereafter ultimately further amended to increase the amount of allowed indebtedness on April 3, 2020 [Case No. 3:19-bk-1971, DE 204] (collectively, the **"DIP Financing Orders"**).

7. In order to effectuate certain requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request for permission to continue to use its two existing bank accounts at Bank of America ("**Bank Account and Cash Management Motion**") [Case No. 3:19-bk-1971, DE 5] – one of which accounts was its payroll account, bearing account no. XXXXXX7579 ("**Payroll Account**")- and the other of which was its primary operating account, bearing account no. XXXXXX6837 ("**Operating Account**"), the latter of which was subject to automatic daily sweeps in favor of CDS under the terms of the proposed DIP Facility (the "**DIP Facility**"). In addition, Debtor sought permission to open a third account with Bank of America, the sole purpose of which was to hold funds earmarked for professionals retained in the Bankruptcy Case, whose fees were included in the DIP Financing discussed below (the "**Carve-**

2

out Account") (all of the foregoing referenced accounts of Debtor, including any accounts that may have been subsequently opened post-petition on behalf of Debtor are hereinafter collectively referred to as the "**DIP Accounts**"). This court approved the Bank Account and Cash Management Motion on April 4, 2019 [Case No. 3:19-bk-1971, DE 43].

8. In order to effectuate certain other requirements of the proposed DIP Financing, Debtor also included among its "First Day Motions" a request to authorize Debtor's retention of an independent Chief Restructuring Officer and separate Turnaround Advisory Firm, which motion was granted first on an interim basis on April 6, 2019 [Case No. 3:19-bk-1971, DE 56] and thereafter on a final basis on May 17, 2019 [Case No. 3:19-bk-1971, DE 109] (collectively the "**CRO/Turnaround Advisory Firm Retention Order**").

9. Pursuant to the terms of the CRO/Turnaround Advisory Firm Retention Order, the CRO and Turnaround Advisory Firm were granted the *sole* authority to act on behalf of Debtor with regard to, *inter alia*:

    a. Opening and closing bank accounts for Debtor;

    b. Writing checks for Debtor and transferring funds of Debtor;

    c. Causing Debtor to enforce any of its contractual rights; and

    d. Causing Debtor to comply with all guidelines of the Office of the United States Trustee.

10. On May 19, 2020, Debtor filed a motion to sell certain of its assets and assign certain of its contracts pursuant to 11 U.S.C. §§ 363 and 365 (the "**Sale Motion**") [Case No. 3:19-bk-1971, DE 207].

11. The DIP Facility approved by the DIP Financing Orders matured on June 15, 2020 by its own terms. The balance thereunder became due to CDS immediately; Debtor was obligated

3

Case 3:20-ap-90140    Doc 76-1    Filed 08/17/21    Entered 08/17/21 16:29:37    Desc
Exhibit Proposed Amended and Supplemental Complaint    Page 3 of 11

to remit to CDS the collected proceeds of all accounts receivable upon receipt in accordance with the terms of the approved DIP Facility.

12.     Thereafter CDS made no further advances under the DIP Facility, though between June 15 and June 23, 2020, CDS declined to exercise control over, and promptly returned to Debtor, certain "PCMH" advances[1] applied for by Debtor from TennCare, plus an additional approximately $3,700.00 in proceeds received, in order to facilitate Debtor's continued operations until the proposed asset sale could close.

13.     On July 20, 2020, this Court approved the sale of certain of Debtor's assets, and assignment of certain of Debtor's assumed contracts, to CareNation (the "**Asset Sale Order**") [Case No. 3:19-bk-1971, DE 254] as set forth in that certain Asset Purchase Agreement dated July 8, 2020 (the "**APA**") attached thereto.

14.     Pursuant to Section 2.07 and other provisions of the APA, CareNation was required to pay to CDS - as opposed to Debtor - the consideration for the purchase of certain of Debtor's assets and assignment of certain of Debtor's assumed contracts.

15.     Specifically, CareNation agreed to pay to CDS (i) $350,000 through a series of scheduled installment payment payments, and (ii) five per cent (5%) of CareNation's net profits for a period of 60 calendar months commencing on the first month following the closing. Specifically, the APA states:

---

[1] Upon information and belief, the Patient-Centered Medical Home (PCMH) incentive is a program of TennCare that offers payment incentives to participating medical practices that adopt the functions of a patient-centered medical home as defined by applicable laws and regulations. Debtor was a qualified PCMH and received certain capitated payments based on its participation in the program. In the Spring of 2020, Debtor applied for certain PCMH "advance payments" that covered a period of time extending beyond the anticipated closing date of the sale of its operations. Not wishing to be in possession of funds that the payors of such advance payments might make in reliance on the assumption that Debtor would continue to provide services after the closing date, CDS disclaimed to Debtor any interest in any proceeds attributable to such advance payments.

4

Case 3:20-ap-90140    Doc 76-1    Filed 08/17/21    Entered 08/17/21 16:29:37    Desc Exhibit Proposed Amended and Supplemental Complaint    Page 4 of 11

> **Section 2.07  Purchase Price.**
>
> Buyer shall pay the cash portion of the Purchase Price, and perform the other consideration constituting the balance of the Purchase Price, as follows:
>
> (a) At the Closing, Buyer shall make a cash payment of Thirty-Five Thousand Dollars ($35,000.00) to CDS as set forth in wiring instructions provided by CDS to Buyer.
>
> (b) On or before January 15, 2021, Buyer shall make a cash payment of Sixty-Five Thousand Dollars ($65,000.00) to CDS payable in immediately available funds by wire transfer to the account of CDS.
>
> (c) On or before July 15, 2021, Buyer shall make a cash payment of Fifty Thousand Dollars ($50,000.00) to CDS payable in immediately available funds by wire transfer to the account of CDS.
>
> (d) On or before December 15, 2021, Buyer shall make a cash payment of Fifty Thousand Dollars ($50,000.00) to CDS payable in immediately available funds by wire transfer to the account of CDS.
>
> (e) On or before December 31, 2021 Buyer shall make a cash payment of the balance of One Hundred Fifty Thousand Dollars ($150,000.00) to CDS payable in immediately available funds by wire transfer to the account of CDS.
>
> (f) Thereafter, for a period of sixty (60) calendar months commencing on the first day of the first month following the Closing, Buyer shall remit to CDS monthly payments in an amount equal to five percent (5.00%) of Buyer's Net Profits for said month (each a "**Net Profit Payment**") from the operation of the Practice. Regardless of how Buyer maintains its Financial Statements, or how and whether it incorporates into existing lines or divisions of Buyer all or some of the Practice or Acquired Assets, Buyer will maintain Financial Statements for a period of not less than seventy-two (72) months in a manner that will enable the accurate calculation of Net Profit generated by the Practice after the Closing. The first Net Profit Payment shall be due thirty (30) days following the first full month after the Closing Date. Net Profit Payments shall by made by Buyer to CDS each month thereafter for a total of sixty (60) months.

[Case No. 3:19-bk-1971, DE 254 at Page 45-46].

16. At the closing of the APA (or immediately thereafter), CareNation paid the first installment payment due to CDS in the amount of $35,000.00.

17. Without disclosing same to the Court, CDS or Debtor's counsel, the CRO and/or the Turnaround Advisory Firm had, during the pendency of this case and in violation of their obligations under the CRO/Turnaround Advisory Firm Retention Order, authorized an employee of Debtor - one Jonathan Garcia ("**Garcia**") - to control Debtor's DIP accounts by allowing him to become an authorized "Primary Administrator", on behalf of Debtor, on the Bank of America Cashpro® online platform. Specifically, Garcia , who was not an authorized signatory on any of the DIP Accounts, was empowered by reason of his designation as "Primary Adminisrator" to

5

perform certain functions on behalf of the CRO and Turnaround Advisory Firm, including, *inter alia*, making electronic payments on behalf of Debtor from the DIP Accounts.

18. Neither the CRO nor the Turnaround Advisory Firm disclosed such authorization to perform *their* exclusive duties under the CRO Order to the Court or any creditors, including CDS.

19. To make matters worse, and despite the fact that the APA did not - and could not - transfer Debtor's DIP Accounts to CareNation, the CRO and/or Turnaround Advisory Firm apparently forgot to terminate Garcia's CashPro® access to Debtor's DIP Accounts after the closing of the sale.

20. Upon closing of the APA, Garcia's employment with Debtor was terminated and Garcia was hired by CareNation.

21. At some point thereafter, Garcia - or someone else at CareNation using Garcia's online credentials on CashPro® - began to make certain other agents of CareNation, including its president Michael Gaw, additional "primary administrators" with access to the DIP Accounts and ability to pay funds out of the accounts.

22. Thereafter, Garcia (or someone at CareNation acting under, or using, Garcia's access to Debtor's DIP Accounts on the CashPro® system) without notice to Debtor began using Debtor's DIP Accounts by, *inter alia*, depositing the proceeds of CareNation accounts receivable into the Carve-Out Account and paying expenses of CareNation from monies deposited into the Carve-Out Account.

23. Thereafter, commencing on or about August 14, 2020, again using its access via the CashPro® online platform, CareNation began withdrawing funds on a daily basis from the DIP Operating Account prior to the automatic sweep set to take place at midnight each night, thereby

6

preventing CDS from being paid in accordance with the DIP Facility and the DIP Financing Orders. CareNation redirected these proceeds to the Carve-out Account into which CareNation was improperly depositing its own proceeds and paying its own debts.

24. Upon learning of CareNation's improper exercise of control over the DIP Operating Account, and the diversion of the funds from the DIP Operating Account into the DIP Carve-out Account (against which there was no standing sweep order redirecting said monies to CDS), CDS contacted Bank of America. Bank of America stated that Michael Gaw, president of CareNation, represented to Bank of America that CareNation had bought the stock - rather than certain assets and contracts - of Debtor.

25. As a result of this misrepresentation, Bank of America incorrectly permitted CareNation to (a) to deposit its own money into the DIP Carve-out Account, and (b) exercise unauthorized control over all of the DIP Accounts. As a further result, Bank of America permitted CareNation to unlawfully redirect money from the DIP Operating Account away from CDS, in violation of the DIP Facility as approved and ordered by the Court.

26. Undersigned counsel made demand on prior counsel for CareNation, through its counsel prior to his withdrawal, for immediate return of the funds improperly diverted by CareNation from the Operating Account, and Carenation refused that demand.

27. Debtor's counsel specifically informed CareNation in writing that CareNation was improperly exercising control over the DIP Accounts, and demanded that CareNation cease and desist immediately.

28. CareNation refused Debtor's demands and continued to improperly exercise control over the DIP Accounts which remained titled in Debtor's full legal name (Capstone Pediatrics PLLC) and which bore Debtor's tax identification number, and in the process,

7

Case 3:20-ap-90140    Doc 76-1    Filed 08/17/21    Entered 08/17/21 16:29:37    Desc
Exhibit Proposed Amended and Supplemental Complaint    Page 7 of 11

improperly collect the proceeds of Debtor's accounts receivable to which CDS was entitled to payment by virtue of the DIP Facility and DIP Orders (to be effectuated through the standing sweep order on the DIP Operating Account), and refused to release any of the funds presently collected in the DIP Accounts.

29. Subsequent to the filing of the lawsuit in this matter, the parties entered into a number of agreed orders entered in this case, beginning with an agreed order granting CDS' request for injunctive relief, and proceeding to a series of subsequent agreed orders through which the parties modified that injunctive relief to allow funds in the frozen DIP accounts to be released to the appropriate party after agreed reconciliations. [Adv. Proc. No. 3:20-ap-90140, Docs. 12, 57, 66 and 72].

30. After those reconciliations were completed by agreement, the parties submitted an agreed omnibus order **(the "Omnibus Order")** which this court entered on May 25, 2021. [Adv. Proc. No. 3:20-ap-90140 Doc. 75].

31. The Omnibus Order authorized the disbursement of the remaining disputed funds from the frozen DIP accounts and provided a mechanism by which the lawsuit could ultimately be dismissed by agreement, contingent on the occurrence of certain specified conditions.

32. However, while the original causes of action asserted in the lawsuit have been tentatively resolved by the entry of the Omnibus Order, CareNation has since violated a separate and independent obligation under the same APA- the obligation to remit the consideration for the APA, as discussed in Paragraph 17, et seq., of this Complaint.

33. Specifically, while CareNation made the first two installments ($35,000 and $65,000 respectively), it has failed and refused to pay an installment of $50,000.00, which was due on July 15, 2021.

8

Case 3:20-ap-90140 Doc 76-1 Filed 08/17/21 Entered 08/17/21 16:29:37 Desc Exhibit Proposed Amended and Supplemental Complaint Page 8 of 11

34. The parties agreed, in Section 10.15 that "Time is of the essence with regards with all dates and time periods set forth or referred to in this Agreement."

35. CareNation has never provided CDS with any net profit payments, as required under Section 2.07(f) of the APA.

36. CareNation has likewise failed to provide CDS access to its books and records for purposes of verifying CareNation's allegations that it has had no net profits, as required by Section 9.01 of the APA.

### III. CAUSES OF ACTION
### COUNT 1
### BREACH OF CONTRACT

37. The allegations set forth in the preceding paragraphs are incorporated and restated herein.

38. CDS is the intended third-party beneficiary of Debtor's rights under the APA with standing to sue for its breach, and the specifically designated payee of the consideration under the APA.

39. CareNation has breached the Contract by failing to remit timely payment of an installment in the amount of $50,000 which was due on July 15, 2021.

40. CareNation has breached the Contract by failing to remit five per cent (5%) of CareNation's net profits for a period of 60 calendar months commencing on the first month following the closing.

41. CareNation has breached the Contract by failing to provide CDS access to its books and records, as required by Section 9.01 of the APA, for purposes of verifying any statements concerning net profit calculations.

9

42. CDS is entitled to a judgment for all damages which flow from CareNation's breach of the APA, including payment of the past due installment payment in addition to any other payments which it fails to pay as they come due.

43. CDS is entitled to a judgment for all damages which flow from CareNation's breach of the APA, including payment of five per cent (5%) net profit in accordance with Section 2.07(f).

44. CDS is entitled to an Order compelling specific performance. Specifically, CDS is entitled to an Order compelling CareNation to specifically perform its audit and disclosure requirements in Section 9.01 of the APA.

**WHEREFORE**, having prayed in full, CDS respectfully requests the following relief:

(1) For a judgment against CareNation for breach of contract in an amount to be determined at trial of this matter, but not less than the total amount owed by CareNation under the APA as such amounts come due between the date of filing this amended and supplemental complaint and the final adjudiciation of this matter;

(2) For an Order compelling specific performance of CareNation's obligations under Section 9.01 of the APA;

(3) For the right to amend this complaint as additional facts or developments warrant;

(4) For such other and further relief as this Court deems appropriate.

10

Case 3:20-ap-90140   Doc 76-1   Filed 08/17/21   Entered 08/17/21 16:29:37   Desc Exhibit Proposed Amended and Supplemental Complaint   Page 10 of 11

Respectfully submitted,

/s/ *Daniel H. Puryear*
Daniel H. Puryear, # 18190
M. Andrew Pippenger, #18183
Puryear Law Group PLLC
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205
615-255-4859 (phone)
615-630-6602 (fax)
dpuryear@puryearlawgroup.com

*Counsel for CDS Business Services, Inc.*
*d/b/a Newtek Business Credit*

11

Case 3:20-ap-90140    Doc 76-1    Filed 08/17/21    Entered 08/17/21 16:29:37    Desc
Exhibit Proposed Amended and Supplemental Complaint    Page 11 of 11